LORRAINE C. COLLINS, a Minor by her Father and Next Friend, Leonard Collins, Plaintiff-Appellant, v. CARY A. STRAKA *et al.*, Defendants-Appellees.

Second District   No. 2—86—1132

Opinion filed December 30, 1987.

356

Patrick M. Flaherty, of Thompson & Lamont, P.C., of Aurora, for appellant.

Gary K. Mickey and Donald C. Bevins, both of Puckett, Barnett, Larson, Mickey, Wilson & Ochsen, of Aurora, for appellees Marlene Hardy and Kaneland Community Unit School District No. 302.

JUSTICE HOPF delivered the opinion of the court:

Plaintiff, Lorraine Collins, brought a personal injury action against defendants, Cary Straka, Marlene Hardy, and Kaneland Community School District No. 302 (the school district). Following a trial by jury, a verdict was returned in favor of defendants Hardy and Straka. A verdict of $16,250 was returned in plaintiff's favor and against the school district. The court entered judgment in the amount of $3,250 to reflect the jury's finding that 80% of the negligence was attributable to the plaintiff. Plaintiff's motion for a new trial on all issues or, alternatively, on the issue of damages alone was denied. Plaintiff filed a timely notice of appeal.

On appeal, plaintiff contends (1) that the jury's award of $16,250 in total damages was inadequate as a matter of law and (2) that the trial court erred in striking portions of an evidence deposition of the treating physician.

Briefly summarized, the facts presented at trial showed that on May 3, 1983, the plaintiff was injured at the Kaneland Middle School-High School complex in Elburn when plaintiff walked into the side of a moving pickup truck as she stepped from between two parked school buses located along a roadway on the premises of the school district. At the time of the accident plaintiff was a 16-year-old junior

at the high school. At the end of the school day in question, plaintiff had boarded one of the buses parked along the roadway when she noticed her mother parked on the opposite side of the street. Plaintiff exited the bus without the permission of the bus driver, as required by school rules, and walked between the bus she had been on and the bus parked immediately ahead of it. As plaintiff stepped from between the two buses, she was injured when she walked into the side of a pickup truck driven by Cary Straka. Testimony showed that Straka was traveling well within the 15 miles-per-hour speed limit and as slow as five miles per hour prior to the point of impact with plaintiff.

Testimony was conflicting regarding whether plaintiff had looked both directions for vehicles before stepping from between the parked buses. Plaintiff first maintained that the mirrors on the bus had obscured her view and that she was struck by the pickup truck as she stepped to look around the mirrors. Later, on cross-examination, when asked if she stepped into the street or if, instead, she looked around the mirrors on the bus, plaintiff responded, "I stepped into the street." Another witness, a bus driver who observed the accident, testified that plaintiff never hesitated at all as she proceeded between the two buses and that plaintiff ran right into the wheel well of the pickup truck.

As a result of the accident, plaintiff suffered a fractured ankle and multiple contusions and abrasions to the lower extremities. The ankle required surgery which included the insertion of K-wires on one side of the ankle and a Rush rod on the other. Plaintiff was placed in a long leg cast which was worn until June 27, 1983, when the cast was replaced with a short leg cast. Plaintiff remained in the short leg cast until July 20, 1983. Following the removal of this cast, plaintiff used crutches until August 5, 1983.

Dr. Sorce, plaintiff's treating physician, testified that plaintiff progressed fairly well into the fall of 1983 and that she continued to do fairly well after the removal of the K-wires and Rush rod. It was Dr. Sorce's opinion that plaintiff's ankle injury may lead to traumatic arthritis and may require further surgical intervention. At the time of plaintiff's last visit, plaintiff had full range of motion in her left ankle. Plaintiff testified that her ankle was still sore when she walked a lot or was very active and that it swelled in damp weather conditions or with activity. On cross-examination, plaintiff admitted that despite her ankle injury, Dr. Sorce had not limited her activities in any manner.

Dr. Sorce had also treated plaintiff for problems with her left knee. An X ray of the left knee, which had been taken on May 9,

1983, during plaintiff's initial hospitalization for the incident occurring on May 3, indicated plaintiff's knee was normal. Plaintiff's first complaint of any knee pain occurred on July 6, 1983, two months after the accident and prior to the removal of the short cast. Dr. Sorce's examination of plaintiff's knee revealed that there was no swelling inside the knee and that the ligaments were stable. Some medial joint line tenderness of the knee existed.

In 1985 Dr. Sorce performed an arthrogram and a diagnostic arthroscopy to determine if plaintiff's complaints of knee pain were due to a vertical tear in the posterior part of the medial meniscus, the cartilage on the inside of the knee. Dr. Sorce stated that the result of the procedures performed on plaintiff's knee revealed that the medial meniscus appeared to be intact and that no tears were found. Mild chondromalacia (a form of arthritis) of the kneecap was present. A later arthroscopy performed in 1986 also revealed mild chondromalacia. As with the prior arthroscopy, Dr. Sorce prescribed an exercise program for plaintiff.

The doctor also testified that plaintiff had suffered a prior injury to her left knee in 1982. At that time Dr. Sorce diagnosed the cause of plaintiff's pain in the left knee as chondromalacia. Dr. Sorce testified that arthritis is a permanent condition because it does not go away although it can become asymptomatic with exercise and appropriate therapy.

Dr. Sorce stated that the prognosis concerning plaintiff's left knee was "guarded" and depended on how plaintiff rehabilitated the muscles with regard to her symptoms. The doctor testified that with an exercise program 90% of the people having chondromalacia get better. In Dr. Sorce's opinion plaintiff fell within the 10% who would need either patella shaving (shaving of the kneecap) and/or an extensor realignment. Sorce based his opinion largely on the personality and recovery rate of the plaintiff, stating that plaintiff was "slow to respond." As of the last time Dr. Sorce saw plaintiff, however, she had full range of motion in her left knee.

Plaintiff admitted into evidence medical bills totaling $13,098.76. The jury awarded plaintiff $16,250 in total damages. That amount was reduced to $3,250 after an assessment of comparative negligence in which 80% negligence was allocated to plaintiff and 20% to the school district. Plaintiff appeals.

Plaintiff first contends that the jury's award of $16,250 in total damages was inadequate as a matter of law because the medical specials alone totaled $13,098.76 and because undisputed evidence of permanent disability and disfigurement and past, present, and future

pain and suffering was presented.

■■ ■ The amount of a verdict is generally within the discretion of the jury (*Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407), and a new trial will not be granted on the ground that damages in a personal injury action are too small. (*Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038, 1039; *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 647.) A reviewing court may order a new trial if the damages are manifestly inadequate or if it is clear that proved elements of damages have been ignored or if the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff. (*Hollis*, 108 Ill. 2d at 407.) To determine whether a jury verdict on the amount of damages is inadequate for any of the foregoing reasons, we must consider the record as a whole. (*Nicholl*, 104 Ill. App. 3d at 648.) Our review of the record convinces us that the damages were not manifestly inadequate and that, unlike the cases cited in plaintiff's brief, they bore a reasonable relationship to the injuries suffered by the plaintiff.

■■ Plaintiff maintains that because the medical specials totaled $13,098.76, the jury's award of $16,250 in total damages was insufficient since it left only $3,250 as compensation for plaintiff's disability and disfigurement and pain and suffering. However, the fact that the jury was less than generous, as plaintiff claims here, does not necessarily mean that its award was legally or palpably inadequate. (*Lee v. Chastang* (1979), 79 Ill. App. 3d 622, 625.) In fact, even if the jury's verdict was less than the claimed special damages, it would not necessarily be considered inadequate. *Nicholl*, 104 Ill. App. 3d at 649.

Here, the medical specials included charges related to plaintiff's knee injury. However, our review of the evidence concerning the knee injury persuades us that it was a jury question whether plaintiff's knee problems resulted from the accident in question. The evidence shows that prior to the 1983 accident, plaintiff had suffered an injury to her left knee in 1982. At that time Dr. Sorce, the treating physician, diagnosed the pain in plaintiff's left knee as chondromalacia, a form of arthritis. According to Dr. Sorce's testimony at trial, arthritis is an irreversible condition although it can become asymptomatic with exercise and appropriate therapy. In other words, while the symptoms may disappear, the arthritis itself does not.

The doctor's testimony showed that plaintiff never complained of knee pain at the time of the 1983 injury and that, in fact, an X ray taken six days after the accident showed that the knee was normal. Plaintiff's first complaint of pain in her left knee occurred on July 6, 1983, two months after the May 3, 1983, accident. An examination of

the knee on July 6 revealed no swelling and only some medial joint line tenderness. The ligaments were stable.

The evidence further showed that the first diagnostic test performed on plaintiff's knee was an arthrogram, which did not occur until June 1985. This test was followed by two arthroscopic procedures, one performed in 1985 and the other in 1986, both of which revealed mild chondromalacia, or arthritis. Based on this evidence, it was not unreasonable for the jury to conclude that plaintiff's knee injury was not directly related to the 1983 accident but rather was connected to the arthritic condition which had first been diagnosed in 1982.

Consequently, if the jury so concluded, any of the medical specials dealing with plaintiff's knee would not have been awarded by the jury in reaching its damage award. Thus, plaintiff's medical specials would have equalled less than the $13,098.76 she claimed at trial. As a result, plaintiff would have received more than $3,250 for pain and suffering and permanent disability and disfigurement, as she contends, and these damages were strictly for the injury to plaintiff's ankle.

The testimony, however, did not decidedly demonstrate, as plaintiff claims, that plaintiff's ankle injury was permanent and progressive. Although Dr. Sorce stated on direct examination that plaintiff's ankle injury was permanent, he testified on cross-examination that the course of recovery with respect to plaintiff's broken ankle was normal and that, as of the time of her last visit to see him, plaintiff had full range of motion in her left ankle. Also, Dr. Sorce did not definitively testify that plaintiff's injury was progressive, as plaintiff maintains. Rather, Dr. Sorce testified only that the injury to the ankle may lead to arthritis and may lead to surgery. Moreover, plaintiff's complaints both to the doctor and in her testimony at trial regarding the continual pain she suffered in her ankle centered on the swelling and pain which occurred in damp, humid weather or when she was active.

It was the jury's function to determine the credibility of the witnesses and to assess the weight to be accorded their testimony (*Nicholl*, 104 Ill. App. 3d at 649; *Robin v. Miller* (1978), 67 Ill. App. 3d 656, 661), as well as to decide the facts and inferences to be drawn therefrom. (*Mesick v. Johnson* (1986), 141 Ill. App. 3d 195, 206.) Despite the fact that the plaintiff maintains that the evidence of pain and suffering was persuasive, the jury apparently believed otherwise. The fact that the jury put a low figure on plaintiff's pain and suffering is not a ground for reversal as such (*Lee*, 79 Ill. App. 3d at 625), and a verdict is adequate if it is within the range of the evidence pre-

sented. (*Taylor v. Manhattan Township Park District* (1985), 138 Ill. App. 3d 23, 27.) Considering the evidence as to the nature and effect of the injury, pain, and suffering, the jury's award of $16,250 does not appear to be manifestly inadequate. We find that plaintiff's damage award was more than sufficient.

■ Plaintiff's second contention is that the trial court erred in striking portions of an evidence deposition of plaintiff's treating physician, Dr. Sorce. Plaintiff argues that the excluded testimony dealt with the entire causal connection between the 1983 accident and plaintiff's subsequent knee problems and that excluding this testimony because plaintiff's questions eliciting expert opinion did not ask for an opinion within a "reasonable degree of medical certainty" was erroneous. It is plaintiff's position that Illinois law no longer requires a doctor's opinion to be expressed in terms of a "reasonable degree of medical certainty."

Plaintiff maintains that since the Illinois Supreme Court in *Wilson v. Clark* (1981), 84 Ill. 2d 186, adopted Rule 703 and Rule 705 of the Federal Rules of Evidence (Fed. R. Evid. 703, 705), the long-standing rule in Illinois that a doctor's expert opinion be based on a reasonable degree of medical certainty has been altered. We find this contention to be erroneous for several reasons. First, as plaintiff herself states in her brief, neither Rule 703 nor Rule 705 characterizes the form of the question required to elicit an expert opinion or the degree of certainty on which the opinion must be based. Rule 703 states:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (Fed. R. Evid. 703.)

Rule 705 states:

> "The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." (Fed. R. Evid. 705.)

Plaintiff admits in her reply brief that defendants' objection to the stricken questions was strictly to the form of the questions. Thus, it is clear from the language of both Rule 703 and Rule 705 that plaintiff's reliance on these rules, as support for the issue raised in her second contention, is misplaced, as neither rule deals with the fact that an opinion question should be formulated in the manner which requires

an expert to express his opinion in terms of a reasonable degree of medical certainty.

■■ Second, the supreme court's adoption of Rules 703 and 705 did not alter or do away with the law in Illinois that the opinion of a medical expert must be based on a reasonable degree of medical certainty. See *Roman v. City of Chicago* (1985), 134 Ill. App. 3d 14, 21; *Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 419.

■■ We note that plaintiff for the first time in this appeal relies in her reply brief on Rule 702 of the Federal Rules of Evidence (Fed. R. Evid. 702) to argue once more that it is no longer necessary to adhere to the traditional form of an opinion question since Rule 702 provides that an expert may testify in the form of opinion *or otherwise.* (Plaintiff's emphasis.) This statement is clearly misleading. The notes of the advisory committee on this proposed rule set forth that "otherwise" refers to an expert's use on the stand of a dissertation or exposition of scientific or other principles relevant to a case which the trier of fact is to apply to the facts. Thus, the rule does not alter the manner and form of expert testimony in the way that plaintiff would like this court to believe.

For all of the reasons stated above, we affirm the judgment of the circuit court of Kane County.

Affirmed.

INGLIS and REINHARD, JJ., concur.