LYNN HEALY, Plaintiff-Appellant, v. BEARCO MANAGEMENT, INC., *et al.*, Defendants-Appellees.

Second District   No. 2—90—0687

Opinion filed July 26, 1991.—Rehearing denied September 6, 1991.

Aldo E. Botti, of Botti, Marinaccio, DeSalvo & Tameling, Ltd., of Oak Brook (Marian H. Donohue, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Lisle, and Thomas A. Brabec and D. Kendall Griffith, both of Hinshaw & Culbertson, of Chicago (Robert G. Black, of counsel), for appellees.

JUSTICE NICKELS delivered the opinion of the court:

This appeal arises from a personal injury action filed by plaintiff, Lynn Healy, on August 10, 1983, against Bearco Management, Inc., Bear & Sons, Inc., and McDonald's Corporation, in the circuit court of Kane County. Plaintiff alleged that she fell on a wet floor as she exited a McDonald's restaurant in Elgin, Illinois, on December 1, 1982, due to defendants' negligence, and as a result she sustained severe and permanent back injuries. Prior to trial the parties stipulated to dismiss McDonald's as a defendant, and at the close of the evidence following the trial, Bearco was granted a directed verdict. The jury found in plaintiff's favor and against Bear & Sons, Inc., hereinafter defendant, in the amount of $120,767.31. This award was then reduced 90% by the jury due to plaintiff's contributory negligence. Plaintiff raises several issues on appeal.

Gerald Bear, owner of the McDonald's, testified as an adverse witness. Describing the physical layout of the restaurant on December 1, 1982, Bear said that there was an east and a west entrance from the outside to the lobby. The lobby had east and west entrances into the dining area which consisted of an L-shaped center section, an east and a west section. The west section was one step down from the center section. The center section could be reached from the east or west.

According to an accident report, plaintiff slipped on a wet floor which was recently mopped and twisted her back about 4:10 p.m. on December 1, 1982. Bear testified that the tile floor was slippery when wet and that a yellow caution sign was put out to warn that the floor was wet. Bear was not there, and he did not know whether the sign was displayed at the time.

Bear also testified that the bucket used to mop the floor had a cautionary sign on it. Although the tile floor had a smooth, flat surface, the tile appeared glazed and shiny when wet which was obvious to the eye. However, Bear said that a cautionary sign was still needed.

Marlene Bratthauer, plaintiff's sister-in-law, testified that she, plaintiff's husband, and plaintiff, entered the restaurant through the west door and sat in the center section to eat. She saw an employee mopping the western section when they entered the restaurant. Bratthauer then noticed an employee mopping the north portion of the center section while they ate and they made small talk with her. When they left the restaurant they walked through the western section. There were no warning signs indicating that the floor was wet, and no one told them that the floor was wet. Plaintiff fell and then Bratthauer noticed the floor was wet. Plaintiff's coat was wet and dirty. Plaintiff's and plaintiff's husband's testimony corroborated this account of the occurrence.

Plaintiff's husband, John Healy, testified that he married plaintiff in June 1979 and that she was in perfect health. Prior to the fall, plaintiff worked full time as a real estate agent, did the housework, yard work, took care of the children and jogged five miles a day. She obtained a broker's license and opened her own business in February 1981. Plaintiff also purchased houses for investment and renovated them through subcontractors and her own labor. Subsequent to the fall, plaintiff could not do any of her former activities.

After the fall, plaintiff was in the hospital for five weeks. Upon returning home, plaintiff remained in bed most of the time and had to walk with a cane. She went back to the hospital about two months later for about seven weeks. She was home again for about seven months during which time she was in constant pain. She had difficulty sleeping, could not run and could not work. In 1984 she went to Marianjoy Rehabilitation Center in Wheaton, Illinois (Marianjoy), for treatment of her severe pain and stayed seven weeks. In 1985, she returned to Marianjoy because of the pain. In June or July 1989, she went into the hospital again.

Dr. Geraldine Holub testified that she was a psychologist and worked with chronic-pain patients. Chronic pain lasted longer than six months and interfered with all aspects of a person's life. She first saw plaintiff on April 22, 1985, and plaintiff had been diagnosed as having arachnoiditis, which was an inflammation of the coating surrounding the spinal cord called arachnoid.

Holub diagnosed plaintiff as having adjustment disorder with depressed mood. An adjustment disorder was how a person reacted to stresses or stressors in life. A person with chronic pain found it difficult to manage stress. Holub said that plaintiff's original major stress was chronic pain and then other stressors were added to her life. The pain caused the adjustment reaction.

Her prognosis was that plaintiff would function at a higher level than at present with the pain under control. Although the chronic pain may continue, plaintiff's adjustment disorder hopefully would not. In her professional opinion Holub said that the fall on December 1, 1982, could have caused plaintiff's adjustment disorder with depressed mood. Holub was professionally and personally certain that plaintiff was not faking pain or using pain to gain sympathy.

During cross-examination, Holub explained that adjustment disorder related to the fact that when there was a stressor in plaintiff's life it would contribute to more physical pain or alternately make plaintiff unable to cope with the pain she had. Pain could increase in part of plaintiff's body due to the stressor, but this was not due to somatization. Somatization was described as a personality trait whereby a person experienced emotional problems or stressors through a physical symptom such as pain. There was no organic cause for the pain, but the person experienced it as a result of somatizing.

Holub was then questioned about post-accident stressors in plaintiff's life which exacerbated her chronic pain condition. Holub also described a psychological concept called secondary gain whereby a person had an advantage accruing to her subsequent to an illness or accident which played a part in creating or perpetuating some type of neurosis. Secondary gain could occur where there was a lawsuit and the possibility of a person being compensated at the end led to the development of physical symptoms which were not due to organic circumstances. Plaintiff did not have secondary gain in Holub's opinion.

Eleanor Supernau, a psychiatric social worker at Marianjoy, had worked with plaintiff's pain management in 1983, 1984, 1985 and 1988. Plaintiff had made progress in her therapy by the time she was discharged in January 1984 and February 1988.

Martha Kretzschmar, a physical therapist at Marianjoy, treated plaintiff in 1984 and 1988. Plaintiff made progress through physical therapy. The therapist's observations of plaintiff led her to conclude that plaintiff was in pain. Kretzschmar had indicated on reports that plaintiff's pain was minimal.

Dr. Mark Lupton, a neurologist, began treating plaintiff in 1983. He diagnosed her condition as arachnoiditis which caused chronic pain syndrome. Arachnoiditis developed in some cases where dye from a myelogram remained in the spine. Plaintiff had a myelogram in the 1960s in England, where it was common not to remove the dye. Lupton opined that plaintiff's condition remained dormant until her fall, which caused the arachnoiditis to become symptomatic.

Lupton stated that some of plaintiff's symptoms could be due to psychological components while some were inconsistent with arachnoiditis. A test referred to as a "Babinski," after its creator, indicated plaintiff's problem was not psychological. He believed plaintiff had elements of depression and somatization, but there was overwhelming evidence of a neurological basis for her problems. His prognosis was that plaintiff would lead a limited life, probably not return to real estate work, and would require medical care and therapy from time to time. The arachnoiditis and the chronic pain were permanent conditions.

Dr. T.G. Limberis, plaintiff's family physician, testified that he saw plaintiff in June 1980 for low back and neck pain brought on by wallpapering and diagnosed lumbar strain. He saw plaintiff in November 1980 for low-neck pain which he diagnosed as muscular. On cross-examination, Limberis' deposition showed that he could not recall what caused plaintiff's problem in June 1980 but testified that he was reminded by plaintiff during her recent visit. Although a nurse noted soreness under the right arm and side of the breast in January 1979, Limberis found breast pain.

Dr. Valentino Menis testified that he was the director of the chronic pain program at Marianjoy and first saw plaintiff on December 28, 1983, when she was admitted. After her stay at Marianjoy plaintiff's condition improved. Menis stated that pain was a totally subjective experience.

Menis found negative "Babinskis" in examining plaintiff which meant that plaintiff had normal functioning of the brain and spinal cord. Menis explained the only significance of the negative Babinski was that plaintiff did not have central nervous system disease.

Plaintiff presented the testimony of six witnesses who testified regarding the many activities of plaintiff prior to her fall and her limited abilities following the fall. Plaintiff's 23-year-old daughter, Donna Van Nurden, her 19-year-old son, Keith Van Nurden, stepdaughter, Stephanie Healy, John Healy's former wife, Carol Tweedie, Dorothy Koon and Joel Lerner testified for plaintiff regarding plaintiff's activities.

Plaintiff called Dr. Sheldon Greenburg, a psychiatrist, who made an evaluation of plaintiff in July 1989. He diagnosed plaintiff as having a "depressive disorder, not otherwise specified," in that she was having significant symptoms of despair, depression and psychological anguish caused by a demonstrative physical cause. Plaintiff's pain was consistent with arachnoiditis. The depressed disorder resulted from the inability to function as she did before the fall. Greenburg did not

believe plaintiff had somatoform pain disorder because of her past history. Plaintiff would have had this disorder prior to the occurrence. Greenburg defined somatoform as a preoccupation with pain in the absence of adequate physical findings to account for the pain or its intensity. Greenburg said that plaintiff was not malingering to gain money but was trying to improve.

He found, contrary to Dr. Cavanaugh, that plaintiff did suffer from psychiatric illness as a result of the fall. She suffered significant despair, depression and feelings of hopelessness. She did not somatize and did not have secondary gain.

Doris Whittaker, a tax preparer for H & R Block, had prepared plaintiff's tax forms from 1979 until the present. She testified that the gross income for plaintiff in 1979 was $29,383; in 1980 $51,844; in 1981 $170,577; in 1982 $83,529; and in 1983 $79,523. She did not determine gross income for 1984 or 1985; however, Whittaker said that plaintiff had no income from sales of real estate in those years. During cross-examination Whittaker explained that income from plaintiff's job as a real estate agent in 1979 was $4,258.34 (less $1,804.56 in deductions); in 1980 it was $1,047.50 (less $660.25); in 1981 it was $6,942.50 (less $13,081.97); and in 1982 it was $35,684 (less $29,909.21). Plaintiff earned no money as an agent in 1983.

Plaintiff testified on her own behalf and related her personal history. She was born in England and studied to be a nurse. In December 1968 she was in a car accident where three others were killed. Plaintiff was hospitalized for a short time with cuts, bruises, shock and sprained back. Plaintiff returned to work about one month later, but while lifting a patient she injured her back due to the prior auto accident. She had a myelogram and then a laminectomy.

Plaintiff described how she fell on the wet floor at the McDonald's on December 1, 1982. She was exiting the center section through the west section when her feet went out from under her. No one told her the floor was wet, and there was no warning sign. She had seen someone working in the east section and holding some type of handle.

Plaintiff was in the hospital until January 1983 and was diagnosed with arachnoiditis. She had physical therapy and returned to the hospital on March 3, 1983, in tremendous pain and stayed until April 27, 1983. At the end of 1983, plaintiff entered Marianjoy's pain clinic for seven weeks. She had bio-feedback training, self-hypnosis and warm-water exercises there. Plaintiff said that she still could not work because of the pain. She now drove with the aid of a special device on her car. She could only do things at home if they were at counter level.

Dr. Gary Skaletsky, a neurosurgeon, examined plaintiff on August 9, 1989. He found that she suffered from arachnoiditis and cervical radiculopathy (irritability of the nerves in the neck). He stated that plaintiff's condition was dormant until the fall at McDonald's.

Dr. James Cavanaugh, a psychiatrist, was called by defendant. He had reviewed documents, depositions, and medical records pertaining to plaintiff and examined plaintiff one time in December 1988. Cavanaugh also had Dr. Grossman, a psychologist, perform tests of plaintiff, and he reviewed test results of plaintiff from 1983, 1984 and 1988.

Cavanaugh said plaintiff had a personality style called somatization, which meant that she experienced emotions as pain. Cavanaugh explained that somatizing did not mean a person had a psychiatric illness or required treatment. It was merely a personality trait. Plaintiff had this trait prior to her fall.

The doctor found that, in part, plaintiff's complaints of pain were due to nonorganic factors. These factors were her personality style of somatizing and the post-accident stressors in plaintiff's life, e.g., loss of her grandparents and loss of a close friend, problems with her children, the instant lawsuit, etc. Relying on Dr. Holub's records, Cavanaugh found that when plaintiff had a post-accident stressor, plaintiff had an increased level of pain. This pattern was typical in a chronic pain patient who somatized. He also found secondary gain which worked together with somatization in plaintiff's case. Secondary gain meant that plaintiff got something out of somatizing such as avoiding emotional issues or financial gain from a lawsuit. Secondary gain did not mean that plaintiff was a malingerer or feigning, but plaintiff was a chronic pain patient.

Cavanaugh disagreed with Dr. Holub's diagnosis and found no evidence of an adjustment disorder with depressed mood. He also disagreed with Dr. Greenburg's diagnosis of depressive disorder related to plaintiff's accident. He found no psychiatric reason why plaintiff could not work. He knew that plaintiff had been hospitalized in 1989, but when he saw plaintiff he agreed with Dr. Holub that plaintiff was capable of certain work even if it was homebound.

Defendant called Sharon Mac Phail, an employee at the McDonald's restaurant at the time of plaintiff's fall. She said that a person could tell the floor was wet by looking at it due to the glare. She identified a photograph of the floor which showed the glare when wet.

Mac Phail saw plaintiff and plaintiff's husband on December 1, 1982, sitting in the center section of the restaurant. She engaged in conversation with the Healys. She did not recall seeing a third party

with them. As Mac Phail exited through the western section, she noticed that the floor was wet. She told the Healys to be careful because the floor was wet. They watched her walk away, but she could not recall if plaintiff answered her. She did not see plaintiff fall.

During cross-examination Mac Phail could not recall seeing the yellow mop bucket or a warning sign about the wet floor. She did not recall putting out the sign. She did not specify to plaintiff that the western section was wet, but plaintiff watched where Mac Phail walked after she gave her this warning.

Defendant played a videotape evidence deposition of Janet Healy, plaintiff's former sister-in-law. She testified that the first time she met plaintiff was in December 1981, when plaintiff, John Healy, and John's daughter came for a visit in Fort Lauderdale, Florida.

They went to the beach and were frolicking around in the water when plaintiff said "oh—ah" and grabbed her back. Plaintiff looked like she was in pain. John Healy picked up plaintiff in his arms and carried her out of the water. They drove back to the motel where Janet Healy's family was staying, and John carried plaintiff from the car to the room. Plaintiff complained of back pain, but got up by herself, walked into the bathroom and changed from her swimsuit on her own. Plaintiff and her husband decided to return to Illinois that day and left. Janet denied disliking plaintiff.

Plaintiff called Walter Hay, the assistant principal of Stephanie Healy's school, in rebuttal. The school records showed that Stephanie did not miss any school during December 1981. Other rebuttal witnesses were called: plaintiff, John Healy, Stephanie Healy, Donna Van Nurden, and Carol Tweedie. The testimony of these witnesses showed that plaintiff was not in Florida in 1981 although she was there in 1978. Plaintiff denied having any back pain while in Florida.

The attorneys for plaintiff and defendant entered stipulations regarding the medical records and the amount of the medical bills incurred by plaintiff. The total amount of these bills totalled $120,767.31. The jury returned a verdict against defendant on the issue of liability and awarded plaintiff $120,767.31 in damages. Plaintiff was found 90% contributory negligent, and her award was reduced to $12,077.

In the first issue, plaintiff contends the trial court erred in denying her motion for a new trial because the verdict was inadequate based upon the manifest weight of the evidence. She also claims that, since the jury awarded damages for pain medication and physical therapy but nothing for pain and suffering, the verdict is inconsistent. (*Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038.) Defendant argues

that the jury reached its verdict based upon conflicting evidence and heard and assessed the credibility of the witnesses. It contends that the verdict should not be disturbed. We agree with plaintiff's latter point.

■ The amount of the verdict is generally within the discretion of the jury, and a new trial will not be granted on the ground that damages in a personal injury action are too small. (*Collins v. Straka* (1987), 164 Ill. App. 3d 355.) However, justice requires that a verdict be set aside and a new trial ordered where the amount of damages is palpably inadequate, or against the manifest weight of the evidence, or where the jury has clearly disregarded a proved element of damages (*Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038), or where it is apparent that the jury made a compromise between the guilt of defendant and the damages sustained by plaintiff (*Kinsell v. Hawthorne* (1960), 27 Ill. App. 2d 314). The standard to be applied in deciding a motion for a new trial is whether the jury's verdict is against the manifest weight of the evidence, and the trial court's determination of a motion for a new trial will not be disturbed absent a clear abuse of discretion. *Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808.

■ The jury awarded plaintiff the exact amount of her medical bills, which included expenses for pain medication and physical therapy. While the bills were not specifically broken down to show medication for pain and physical therapy (*Griffin v. Rogers* (1988), 177 Ill. App. 3d 690; see *Elliott v. Koch* (1990), 200 Ill. App. 3d 1), the stipulated bills read to the jury included expenses for Marianjoy, Regency Medical Supplies, Neuman Medical Supplies, and "medication." There was testimony that plaintiff received pain medication, used a device called a TENS unit for therapy, and received physical therapy at Marianjoy. The evidence established that the medical bills included pain medication and physical therapy.

Despite the fact that the jury awarded plaintiff pain-related expenses, it failed to compensate her for pain and suffering. If the jury believed plaintiff had no compensable pain and suffering, its award of pain-related expenses was contrary to the manifest weight of the evidence. Or, if it believed that plaintiff's pain and suffering were sufficiently serious to justify the expenses, the jury's failure to compensate for pain and suffering means it disregarded a proved element of damages. (*Kumorek v. Moyers* (1990), 203 Ill. App. 3d 908, 912-13; *Hinnen*, 144 Ill. App. 3d at 1046; accord *Rice v. Merchants National Bank* (1991), 213 Ill. App. 3d 790, 572 N.E.2d 439; *Schranz v. Halley* (1984), 128 Ill. App. 3d 125.) The jury's verdict is irreconcilably incon-

sistent and must be set aside and a new trial on damages granted. *Kumorek*, 203 Ill. App. 3d at 913.

While this court upheld a jury verdict which awarded $300 for reasonable medical expenses and nothing for pain and suffering and disability based upon the evidence (*Paulan v. Jett* (1989), 190 Ill. App. 3d 497), the *Paulan* court was not presented with an issue concerning an inconsistent verdict. We later found an inconsistent verdict in *Rice*. Also, the plaintiff in *Paulan* did not seek further medical treatment until 19 months after the initial injury, and the award was approximately equal to the cost of only the initial medical treatment. This court reasoned that the jury may have found the plaintiff failed to prove significant pain and suffering. Here plaintiff was compensated for treatment at Marianjoy which occurred after the initial stay in the hospital, indicating that the jury may have found pain and suffering and yet failed to award for it.

Although we realize that an itemized verdict was used in *Rice* and *Hinnen*, the award in the instant case was clearly the exact dollar amount for plaintiff's medical expenses, which included pain medication and physical therapy. Defendant acknowledged before the trial court that the award represented only plaintiff's medical bills. A new trial on damages only is necessary as we are satisfied that the liability verdict was clearly supported by the evidence, the questions of liability and damages are separate and distinct, and there is nothing to suggest the verdict was a compromise. *Giardino v. Fierke* (1987), 160 Ill. App. 3d 648, 652.

■ Plaintiff further claims that the jury's verdict that she was 90% contributorily negligent is against the manifest weight of the evidence. A plaintiff is guilty of contributory negligence when she fails to exercise that degree of care which a reasonably prudent person would have used for her own safety under like conditions, and which failure is the proximate cause of her injury. (*Beeler v. Chem-Lawn Corp.* (1989), 183 Ill. App. 3d 648, 654.) A jury's finding on the issue of comparative negligence will not be set aside on review absent a finding that the verdict is against the manifest weight of the evidence. (*Shiner v. Friedman* (1987), 161 Ill. App. 3d 73.) A plaintiff has no duty to anticipate and guard against a defendant's negligence. *Owens v. Stokoe* (1985), 140 Ill. App. 3d 355, *aff'd* (1986), 115 Ill. 2d 177.

■ The evidence showed that employees were mopping in parts of the restaurant when plaintiff entered although plaintiff said she did not see what they were doing. Mac Phail testified that she actually told plaintiff the floor was wet and to be careful. Plaintiff observed

where Mac Phail went and was put on notice that the floor was wet. While plaintiff denied being told the floor was wet, it was the jury's function to determine the credibility of the witnesses and to assess the weight to be accorded their testimony as well as to decide the facts and inferences to be drawn therefrom. (*Collins*, 164 Ill. App. 3d at 360.) There was also evidence that the floor became glazed and shiny when wet which was obvious to the eye. Where a danger is obvious to a person of ordinary intelligence, the law will charge one with knowledge of it. (*Blacconeri v. Aguayo* (1985), 132 Ill. App. 3d 984.) Plaintiff denied noticing that the floor was wet; however, this testimony again went to her credibility.

There were two entrances to the eating section of the restaurant. Plaintiff could have exited the center section without walking through the western section. If a person has available to her two different ways of proceeding, one hazardous and the other safe, and she consciously chooses the former and is injured as a consequence of her choice, she is contributorily negligent. (*Blacconeri*, 132 Ill. App. 3d at 989.) Although she distinguishes the four-lane highway in *Blacconeri* as a more serious hazard to avoid, the point is the availability of a safe alternative and not the severity of the hazard to be avoided. The jury's finding was not against the manifest weight of the evidence.

Plaintiff contends that the trial court erred in admitting the videotape evidence deposition of Janet Healy because the operator of the video camera did not comply with Supreme Court Rule 206(f). (134 Ill. 2d R. 206(f).) According to the record, defendant sought Janet Healy's deposition but it was plaintiff who was responsible for it being videotaped. Thus, noncompliance with Rule 206(f) was the fault of plaintiff.

■ The trial court may order that information obtained through abuse of discovery procedures be suppressed. (134 Ill. 2d R. 219(d).) It is within the discretion of the trial court to permit the use of videotaped, as opposed to transcribed, depositions. (*People v. Johnson* (1987), 118 Ill. 2d 501.) The objective of the reviewing court is not to determine whether the record is totally free of error but whether any error occurred which substantially prejudiced a party and affected the outcome below. *Eisenbrandt v. Finnegan* (1987), 156 Ill. App. 3d 968.

■ Plaintiff has not alleged how noncompliance with the procedure of videotaping prejudiced her. She does not allege any conflict between the videotape and the transcription of the deposition, any specific problem in the videotape itself, or any inappropriate editing or alteration. The transcript was available for the parties and the trial court to verify the accuracy of the videotape. Although Rule 206(f) is

designed to insure reliability and authenticity, the availability of a proper transcript of the deposition and plaintiff's failure to establish any prejudice from noncompliance show that the trial court did not abuse its discretion in admitting the tape.

While plaintiff uses *Johnson* to argue that the trial judge's exercise of discretion presupposes compliance with Rule 206(f), it is apparent the trial court was fully aware that Rule 206(f) was not followed. The failure to follow Rule 206(f) did not *per se* render the videotape inadmissible under the facts of this case.

■ Plaintiff argues that once the videotape deposition of Janet Healy was admitted, plaintiff should have been allowed to present evidence of Janet's alcoholism and bias against plaintiff. Plaintiff cites to the record wherein she claims she sought to introduce three rebuttal witnesses on alcoholism; however, the record clearly does not support this claim. See *Hirn v. Edgewater Hospital* (1980), 86 Ill. App. 3d 939, 952.

Plaintiff made no offer of proof regarding the alcoholism issue. A party cannot obtain reversal based on the failure to admit evidence without showing what that evidence would be in order to allow this court to assess the prejudice. (*Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716.) While a less formal statement of counsel is acceptable as an offer of proof (see *Clay v. McCarthy* (1979), 73 Ill. App. 3d 462), the informal offer must be specific, or the error will not be preserved. (*Mulhern v. Talk of the Town, Inc.* (1985), 138 Ill. App. 3d 829.) An informal offer of proof which merely summarizes the witness' testimony in a conclusional manner does not preserve the error. *Mulhern*, 138 Ill. App. 3d at 834.

Plaintiff claims that during the hearing on defendant's motion *in limine*, there was argument which sufficiently preserved the issue on alcoholism. The record consists of general remarks by plaintiff's counsel. It is impossible to identify which witnesses would have testified to this information or what time period this information was based on; nor is there anyway to tell the specifics of the information. Due to the inadequacy of the record and the lack of an offer of proof, plaintiff's argument is waived. *Mulhern*, 138 Ill. App. 3d at 834.

Plaintiff also refers to rebuttal testimony by John Healy and Bratthauer regarding bias. However, the record is insufficient to allow review of these issues. *Mulhern*, 138 Ill. App. 3d at 834.

■ Turning to the bias issue, plaintiff's offer of proof showed that she and some of the rebuttal witnesses would have testified that during their visit to Florida in 1978, Janet, who was drinking, and Clem Healy requested money from John Healy. John Healy refused to

give them any more money or to go into business with Clem, and an argument ensued.

Rebuttal evidence must address material issues and not collateral matters, or it is properly denied. (*Hall*, 152 Ill. App. 3d at 721.) Evidence which tends to establish or show a state of ill feeling on the part of a witness toward a party may be received at trial when it is direct and positive rather than remote or uncertain. *Taylor v. Checker Cab Co.* (1975), 34 Ill. App. 3d 413.

Although plaintiff refers to a "recent" refusal to give Janet money, the offer of proof showed the money issue arose in 1978, over 10 years prior to Janet's testimony. This evidence would have been too stale and remote in time to aid the jury in weighing Janet's testimony. (See *Taylor*, 34 Ill. App. 3d at 421.) Also, the offer of proof showed that John Healy refused the money and not plaintiff, another indication that the "bias" plaintiff alleged was remote and uncertain. The testimony was properly excluded.

Plaintiff refers to two "significant" facts the jury was not informed of because the proceedings were outside its presence. Contrary to these statements, the record shows the jury was sufficiently apprised of these facts. Plaintiff's reliance on *DiBenedetto v. County of Du Page* (1986), 141 Ill. App. 3d 675, and *People v. Provenzano* (1922), 305 Ill. 493, are clearly different examples of bias than the facts herein.

■ Plaintiff raises several points of error with respect to the examination of certain witnesses. The points of error, except with respect to Bear's testimony and rebuttal witnesses, were not included in plaintiff's post-trial motion, and, hence, plaintiff has waived the issues. (*Rexroat v. Devine* (1987), 157 Ill. App. 3d 284.) Plaintiff's general statement in her post-trial motion that "court's rulings permitted defendant to go beyond the scope of direct examination and unduly restricted the plaintiff's direct and redirect examination" is insufficient to preserve the issues.

Furthermore, plaintiff merely claims that she was prejudiced by certain rulings with respect to the examinations of Drs. Lupton and Greenburg. She has failed to provide a legal basis or cite authority regarding why the rulings were improper. The party prosecuting the appeal bears the burden of showing affirmatively the errors assigned on review. (*In re Estate of Elson* (1983), 120 Ill. App. 3d 649.) Bare contentions without argument or citation of authority do not merit consideration on appeal. (*Britt v. Federal Land Bank Association* (1987), 153 Ill. App. 3d 605.) We deem these points waived.

During defendant's examination of Gerald Bear, Bear testified that McDonald's Corporation inspected the restaurant at various times to determine if specifications were adhered to. Plaintiff was not allowed to question Bear regarding a probationary period the restaurant was under sometime prior to the accident. Plaintiff argues that this omission prejudiced her.

First, plaintiff was permitted to make an offer of proof, but she did not. The issue has not been preserved for review. (*Piano v. Davison* (1987), 157 Ill. App. 3d 649, 668.) Second, plaintiff has failed to legally explain, other than claim prejudice, why the trial court's determination to exclude the evidence was in error. The party prosecuting the appeal bears the burden of showing affirmatively the errors assigned on review. (*In re Estate of Elson* (1983), 120 Ill. App. 3d 649.) In any event, even if evidence is relevant it may not be admissible if its probative value is substantially outweighed by the danger of unfair prejudice, and this matter is within the sound discretion of the trial court. (*People v. Chambers* (1989), 179 Ill. App. 3d 565.) The probationary period had occurred prior to the time of this incident. The trial court found that past failures or probationary periods were too prejudicial, and plaintiff has failed to show how the court abused its discretion by excluding this evidence.

Plaintiff's motion *in limine* to prohibit defendant from cross-examining rebuttal witnesses about any trips to Florida prior to 1981 was denied. She claims the court abused its discretion in allowing such latitude in cross-examination and confused and prejudiced the jury.

Plaintiff gives the false impression that defendant cross-examined her rebuttal witnesses about prior trips to Florida other than 1981, when no such cross-examination occurred. The record shows that after the court denied plaintiff's motion *in limine*, plaintiff's attorney asked plaintiff and four other witnesses on direct whether plaintiff was in Florida in 1978. It was plaintiff's questions and answers on direct examination that brought out the 1978 trip to Florida. (See *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 500.) Defendant asked no questions relating to the 1978 trip, or any other trip. No error occurred.

Plaintiff asserts that the trial court erred in failing to grant her motion for a mistrial when defendant on two separate occasions alerted the jury to plaintiff's disability income. She claims defendant violated an order *in limine* which precluded all mention of insurance. Dr. Holub testified that plaintiff received disability income. Plaintiff's objection was sustained, and the court later instructed the jury to dis-

regard the question and answer. The record shows that defendant did not alert the jury to this fact a second time.

■■■ Not every mention of the word "insurance" during a personal injury trial requires the court to declare a mistrial. (*Twait v. Olson* (1982), 104 Ill. App. 3d 191.) Reference to insurance during trial is not *per se* reversible, as prejudice must be shown. (*Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713.) The decision to grant a mistrial is within the discretion of the trial court, whose decision will not be disturbed absent an abuse of discretion. (*Goldstein v. Scott* (1982), 108 Ill. App. 3d 867.) The question, of course, is whether the improper reference was so prejudicial as to have required a mistrial. Also, violations of a motion *in limine* must be clear and rise to the level of having so prejudiced plaintiff to have denied her a fair trial. *Smith v. Perlmutter* (1986), 145 Ill. App. 3d 783.

■■■ The court did not abuse its discretion in denying plaintiff's motion for a mistrial. Despite the fact that no lost wages were awarded, the remark was made only once during a lengthy trial. (*Joynt v. Barnes* (1979), 71 Ill. App. 3d 187.) In view of the references to medical insurance and financial gain from the lawsuit made throughout the trial, this one statement was not sufficiently prejudicial to warrant a mistrial. The objection was sustained, and the jury was properly instructed to disregard the matter. On remand, of course, we trust this error will not occur again.

Plaintiff asserts that the trial court abused its discretion in allowing defendant to file an affirmative defense of contributory negligence three days before trial. Defendant's motion to file the affirmative defense was allowed on December 1, 1989, and trial commenced on December 5, 1989.

■■■ A trial court has broad discretion to allow amendments and supplements to pleadings. (*Halliburton Co. v. Marlen* (1987), 154 Ill. App. 3d 111.) Whether discretion was properly exercised is determined by whether the amendment furthers the ends of justice; the ultimate efficacy of the claim and the previous opportunities to assert a claim may be taken into account. (*Champaign National Bank v. Landers Seed Co.* (1990), 194 Ill. App. 3d 1019.) The timeliness of the amendment and whether other parties have been prejudiced or surprised by the amendment are factors to consider. (*American Pharmaseal v. TEC Systems* (1987), 162 Ill. App. 3d 351.) Also, the courts look to whether the amendment concerns matters which the pleader knew at the time the original pleading was filed and whether good reason for not filing is offered by the pleader. *Hoffman v. Nustra* (1986), 143 Ill. App. 3d 259.

■■ Defendant has offered no explanation for its failure to raise the defense for over four years of the litigation. (*American*, 162 Ill. App. 3d at 360-61.) However, the affirmative defense of plaintiff's contributory negligence had been raised by one of the two trial defendants, Bearco Management, as early as September 1983, although the defense was not later preserved in subsequent answers. (See *Baird & Warner, Inc. v. Ruud* (1976), 45 Ill. App. 3d 223; *cf. American*, 162 Ill. App. 3d at 360 (where other defendants who raised defense had settled with plaintiff).) Plaintiff did not claim surprise before the trial court or ask for additional time to prepare to meet the defense (*Baird & Warner*, 45 Ill. App. 3d at 230) but merely argued that the defense had not been filed before. The fact that the jury obviously found in favor of defendant on the affirmative defense is not in and of itself prejudice from allowing the amendment as plaintiff contends. Plaintiff has failed to assert below or to demonstrate on appeal how her defense to this issue was prejudiced by the late filing. The record shows that plaintiff presented testimony through herself, John Healy and Marlene Bratthauer to contradict defendant's witnesses, and we find no error in the court's ruling.

Plaintiff's last issue concerning the denial of her motion for a new trial need not be addressed in view of our determinations on the various issues raised. The judgment of the trial court is reversed for the reasons given, and the cause is remanded for retrial solely on the issue of damages. Since we do not disturb the jury's finding of 90% contributory negligence, the trial judge shall enter judgment in the amount of 10% of the verdict on remand. *Rice*, 213 Ill. App. 3d at 802-03, 572 N.E.2d at 448.

Affirmed in part; reversed in part and remanded.

WOODWARD and INGLIS, JJ., concur.