2022 IL App (1st) 210761
No. 1-21-0761
Opinion filed December 5, 2022

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10 CR 21758 |
| DARRON ROUSE, | ) ) ) | The Honorable Nicholas Ford, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Presiding Justice Lavin dissented, with opinion.

**OPINION**

¶ 1    After a bench trial, the court found Darron Rouse guilty of one count of armed robbery. We affirmed a direct appeal challenge to Rouse's sentence, after which Rouse filed a postconviction petition. Three claims are relevant here, all involving ineffective assistance of trial counsel (i) for interfering with his right to a jury trial, (ii) for failing to prepare for and present Rouse's testimony, and (iii) for failing to call Rouse's sister to testify. The trial court dismissed Rouse's petition at the second stage of postconviction proceedings.

¶ 2 Critical to our review, the State failed to challenge Rouse's counsel's alleged errors on the merits for the first two claims. Instead, the State argues (i) the record rebuts that Rouse's counsel's actions denied him the right to a jury trial and (ii) Rouse inadequately pled his claim that counsel ineffectively prevented him from testifying. We reject these arguments because (i) the trial court's admonishments about Rouse's right to a jury trial were incomplete and so do not rebut his claim and (ii) Rouse's petition adequately alleges that by failing to prepare him, his counsel prevented him from testifying. And given that Rouse's sister's proposed testimony is largely corroborative of his testimony (which the State does not challenge on the merits), we find Rouse has made a substantial showing of a reasonable probability the outcome of his trial would have been different had counsel performed adequately.

¶ 3 We reverse and remand for an evidentiary hearing consistent with the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)).

¶ 4 Background

¶ 5 The trial court found Rouse guilty of one count of armed robbery after a bench trial. Immediately before trial, the trial court admonished Rouse about giving up his right to a jury trial. Rouse agreed that he understood that, by going forward with a bench trial, the judge would decide his guilt or innocence. He also understood his right "12 of [his] peers who decide [his] guilt or innocence" with "any decision they would make *** be[ing] unanimous meaning they would all have to agree." Rouse denied receiving threats or promises in exchange for choosing a bench trial and affirmed he was choosing a bench trial "of [his] own free will." The trial court found Rouse's jury waiver valid, and after arguments on counsel's oral motion to suppress a show-up identification of Rouse (which the trial court denied), the parties proceeded to trial.

¶ 6 Khuiin Hangora and Salman Ali offered substantially similar testimony about the incident. The two were getting food at a Maxwell Street Polish stand. Ali had explained to Hangora that he was looking to buy a car for his wife. While the two were waiting in line, Rouse approached them and told them about an SUV he had for sale. After Ali asked a few questions about the condition of the SUV, the three men got out of line and went to see it. They got into Hangora's car—a BMW—with Hangora driving, Ali in the front passenger seat, and Rouse in the back seat. Rouse gave Hangora directions and after about five minutes, they stopped across from a parking lot where Rouse pointed to a car that matched the description.

When Hangora stopped, Rouse pulled out a revolver and said, "put your head down. Put your hand[s] on the lap." Rouse then demanded everything Hangora and Ali had, including their cell phones, as he pointed the revolver back and forth between them. Hangora gave Rouse his cell phone (a Blackberry), his keys, and between $1200 and $1300. Ali gave Rouse his cell phone and $1500 to $1700 in cash. Rouse told Hangora and Ali not to look back and to count to 100. He then got out on the passenger side. Hangora watched as Rouse went north and then west, before moving out of sight. Ali explained that he watched Rouse leave in the side mirror and saw him "ma[k]e a left towards the fire station," before losing sight of him.

¶ 7 Ali then called 911 with a second phone Hangora kept in his pocket. The police arrived, and Hangora and Ali gave them a description. A "short time later" officers returned with a suspect in a police wagon. Ali and Hangora went over and saw Rouse in the back. Officers then took Hangora and Ali to the police station where they identified their phones, cash in similar denominations as the money they had earlier, and a gun officers recovered as the revolver Rouse pointed at them.

¶ 8   Earlier, Chicago police officers Stanley and Wenta were on patrol. They responded to a robbery call and got a description of the offender from Hangora and Ali. After broadcasting the description, the officers received a radio communication that an officer on another beat had seen someone matching it. As they drove to the location, they saw Rouse coming towards them being pursued by Sergeant Villalobos, another officer. Wenta noticed Rouse "making a tugging motion to his waistband," and Stanley got out of his car to follow Rouse on foot.

¶ 9   Rouse went into an alley and, when Rouse's path became blocked, Stanley saw Rouse grab "what [Stanley] observed to be a handgun and attempt[ ] to throw it onto a rooftop." The gun did not make it onto the roof, instead hitting the wall of an adjacent building and falling back into the alley. Stanley "immediately" went to retrieve the gun while Wenta and Villalobos continued to chase Rouse (at trial, Stanley identified the revolver he recovered as the one he saw Rouse throw). When Stanley caught up to them, Rouse had been arrested.

¶ 10   Wenta searched Rouse's pockets and found a cell phone and money, specifically a Blackberry and $2995. Wenta admitted on cross-examination that there was nothing unique about the money and it was all in cash. Stanley then called for a fire engine with a ladder to investigate the roof where Rouse had attempted to throw the gun. An officer scaled the ladder and found another cell phone on the roof. Stanley admitted, however, that he did not see Rouse throw a cell phone toward the roof.

¶ 11   As part of the defense case, the parties stipulated that an expert in fingerprint evidence would testify that one latent print suitable for comparison on the revolver did not match Rouse. He also would testify that no fingerprints suitable for comparison were found on the recovered ammunition. The parties further stipulated to testimony from an employee at Chicago's Office of

Emergency Management and Communications, who would verify the description of the offender broadcast over the radio.

¶ 12     When it came to Rouse's testimony, the court had this colloquy:

"THE COURT: Darron, you have the absolute right to testify or not testify. It's kind of something you decide yourself. You can consult with your attorney about it; but in the end, it's up to you. Do you understand that?

ROUSE: Yes, sir.

THE COURT: Have you talked with [your counsel] about whether or not you wanted to testify or didn't want to testify?

ROUSE: Yes, sir.

THE COURT: And which path do you want? Do you want to testify or not testify?

ROUSE: I would like to testify."

At that point, Rouse's counsel asked for a moment and had a discussion off the record. When the proceedings returned to the record, the colloquy continued:

"THE COURT: So do you want to testify or not, Darron?

ROUSE: Sir, no, sir.

THE COURT: You talked with [your counsel] about this. Did anyone threaten you or promise you anything to make you choose not to testify?

ROUSE: No.

THE COURT: Are you choosing not to testify of your own free will?

ROUSE: Yes, sir

.

THE COURT: And this is after talking it over with your attorney?

ROUSE: Yes, it is.

THE COURT: Previously you said you wanted to testify. Do you want to

testify or you don't want to testify?

ROUSE: I don't. She explained something to me."

After the court determined Rouse's waiver of his right to testify "knowing, intelligent, and voluntary," The defense rested without further witnesses.

¶ 13    The trial court found Rouse guilty of armed robbery and concluded he used a firearm. The court sentenced Rouse to 9 years' imprisonment for the underlying robbery with a mandatory 15-year enhancement for using a firearm, bringing Rouse's total sentence to 24 years. On direct appeal, Rouse argued that the 15-year enhancement was unconstitutional; this court rejected that argument and affirmed. *People v. Rouse*, No. 1-11-3015 (2013) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 14    Rouse filed a *pro se* postconviction petition, which the trial court docketed and advanced to the second stage. Rouse eventually made *pro se* amendments to his petition, and his counsel elected to stand on the petition he filed. Counsel filed a certificate under Illinois Supreme Court Rule 651(c) (eff. Jan. 1, 1967).

¶ 15    Rouse raised several claims. The first relevant here, Rouse claimed that trial counsel was ineffective "where [her] failures prevented [Rouse] from testifying." Rouse acknowledged that the on-record colloquy with the trial court "indicates that [he] knowingly waived his right to testify." But he claimed that counsel told him, in an off-record discussion, that "if he testified it would make her look bad because she didn't go over what his testimony would be." Rouse alleged that counsel ended their discussion by saying, "he needed to go along with her on this." Anticipating the State would argue waiver, Rouse alleged that "he wasn't aware of all his options and rights

during the court's admonishments and moreover, that he [was] afraid of the consequences if he snitched on his trial counsel." Rouse attached a notarized affidavit to his petition attesting to these facts.

¶ 16    Rouse also claimed trial counsel was ineffective for preventing him from exercising his right to a jury trial. Rouse alleged that he spoke with his counsel before trial, who told him that he should "take a bench trial." Rouse responded that he believed a guilty verdict after a bench trial would be harder to appeal. Counsel rebuffed, telling Rouse his belief was a myth and that "if [Rouse] did not take a bench trial she would withdraw from representing him." Based on this discussion, Rouse chose a bench trial. Rouse further alleged that the trial court's on-record admonishments about his right to a jury trial did not make clear that he could have told the court about counsel telling him she would withdraw. Rouse's petition went on to say that he took trial counsel's admonishments to heart because he had "a brief criminal history [and had] never been to trial before." As with his previous claim, Rouse's notarized affidavit contains these facts.

¶ 17    Finally, Rouse claimed that trial counsel was ineffective for failing to call his sister as a witness. This claim is not in the petition because, as Rouse's appellate counsel explains, pages appear to be missing from the record. We can tell Rouse raised this claim, however, because the State responded to it in its motion to dismiss.

¶ 18    As to Rouse's claims about counsel failing to call him and his sister to testify, Rouse's affidavit alleged:

"[Rouse] informed [his] attorney that [he] had the money in [his] pocket (about $3,000.00[)] because [he] owed multiple fines for driving with [a] suspended license and that on the date that [he was] arrested [he] brought proof of insurance for the vehicle he was driving so the Court threw out the fine that I thought I would

receive. That [he was] on [his] way to DeKalb via public transportation when [he]

was stopped by officers who eventually took the money I had. That [his] sister

[would be] able to verify the fact that [he] had the money prior to leaving home that

day."

The State moved to dismiss arguing that Rouse's claims about counsel preventing him from taking

a jury trial or testifying were foreclosed by the trial court's admonishments. As to Rouse's claim

about his sister's testimony, the State argued that, because she would be a biased witness, counsel

had a valid strategy for not calling her to the stand. The trial court granted the State's motion and

dismissed Rouse's petition.

¶ 19                                    Analysis

¶ 20    Rouse repeats the arguments he made in the trial court on ineffective assistance of counsel:

(i) interfering with his right to a jury trial, (ii) preventing him from testifying and, relatedly, being

unprepared to question him, and (iii) failing to call Rouse's sister to corroborate the non-criminal

reason Rouse had almost $3000 in cash on him the day of the robbery. In the event we would be

inclined to find he forfeited the failure-to-prepare aspect of his second claim of ineffective

assistance, Rouse argues postconviction counsel provided unreasonable assistance by failing to

put that claim in its proper form. The State offers varying responses to each claim.

¶ 21                          *Post-Conviction Hearing Act*

¶ 22    The Act provides a mechanism for criminal defendants to raise constitutional challenges

to their convictions or sentences. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Where, as

here, the trial court dismisses the petition at the second stage of proceedings, we consider whether

the petition makes a "substantial showing of a violation of constitutional rights." *Id.* at 381. We

take all the petition's well-pled facts as true, unless contradicted by the record, and we construe

them liberally in the petitioner's favor. *Id.* at 382. When a petitioner bases their claims on matters outside the record, "it is not the intent of the [A]ct that [such] claims be adjudicated on the pleadings." (Internal quotation marks omitted.) *Id.* Because the trial court is prohibited from making fact findings or credibility determinations, we review second stage dismissals *de novo*. See *id.* at 388-89.

¶ 23    All of Rouse's claims related to his trial counsel are governed the two-pronged test evaluating deficiency and prejudice set out in *Strickland v. Washington*, 466 U.S. 668 (1984). Rouse must make a substantial showing that (i) his trial counsel's performance was deficient and (ii) the deficient performance prejudiced him. *People v. Utley*, 2019 IL App (1st) 152112, ¶ 36. We evaluate counsel's deficiency by determining whether her performance "was objectively unreasonable under prevailing professional norms." (Internal quotation marks omitted.) *Id.* ¶ 38. And we evaluate prejudice by asking whether there is a reasonable probability that the result of the trial would have been different had counsel performed adequately. *Id.* ¶ 50.

¶ 24    We will evaluate each of Rouse's claims in turn, but before we do, we address two attempts the State made at oral argument to press claims not raised in its brief. First, the State's brief contains no argument challenging deficiency or prejudice under *Strickland* for Rouse's claims that counsel impeded his right to a jury trial and that counsel prevented him from testifying. Moreover, the State's brief makes no argument that Rouse's claim about his counsel preventing him from testifying is rebutted by the record. The State's brief does make that argument about Rouse's jury trial claim, citing *People v. Knapp*, 2020 IL 124992, but neither *Knapp* nor an argument based on

*Knapp* appear in the section of its brief addressing Rouse's ineffectiveness claim related to his right to testify.

¶ 25    During questioning on these points, a member of the panel asked whether we would have to address these issues anyway. We do not; indeed, fairness to the adverse party for whom the issue is new and a surprise and to the court that lacks the benefit of the parties' analysis dictates that we do not. The Illinois Supreme Court rules governing briefs, which apply with equal force to appellants and appellees, explain that arguments not raised in briefs are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised *** in oral argument, or on petition for rehearing."); Ill. S. Ct. R. 341(i) (eff. Oct. 1, 2020) (applying, among others, Rule 341(h)(7) to briefs for appellees). And this rule serves a vital function: to prevent gamesmanship and preserve our role as a court of *review* unless exigent circumstances, not present here, exist.

¶ 26    We acknowledge, of course, that petitioners bear the burden of making a substantial showing of a constitutional violation to warrant relief under the Act. *E.g.*, *People v. Domagala*, 2013 IL 113688, ¶ 35. But our supreme court has long held that "the principle of waiver applies to the State as well as the defendant in a criminal case," even in situations where the defendant bears the ultimate burden on the merits. See *People v. Holloway*, 86 Ill. 2d 78, 91 (1981) (applying waiver to State's failure to argue against defendant's standing to raise motion to suppress); see also *People v. O'Neal*, 104 Ill. 2d 399, 407 (1984) (applying waiver to State even where State responded to defendant's argument but later did so under a different theory).

¶ 27    The dissent contends the majority has turned the burdens allocated to postconviction petitioners raising *Strickland* claims "on their head." *Infra* ¶ 73. We respond in two ways: (i) the cases the dissent cites allow, but do not *require*, that we excuse an appellee's waiver or forfeiture

and (ii) even recognizing that we could excuse the State's forfeiture, taking into account the litigation posture of this case, we will not.

¶ 28 Turning first to the dissent's cases, they do no more than allow us to consider an appellee's unbriefed arguments in certain circumstances. The dissent cites *People v. Jefferson*, 2021 IL App (2d) 190179, for the unremarkable proposition that a party's waiver is not binding on us and we "ha[ve] the authority to recognize, unassisted by the appellee, an obvious lack of merit in a briefed issue." *Infra* ¶ 73; *Jefferson*, 2021 IL App (2d) 190179, ¶ 37. That we have the authority does not mean, however, that we should exercise it in every case. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) ("We do not feel that a court of review should be compelled to serve as an advocate for the appellee or that it should be required to search the record for the purpose of sustaining the judgment ***."). Indeed, our supreme court gave us permission to supplement an appellee's submission on our own only where "justice requires" and the record is simple and appellant's claims easy to decide. *Id.*

¶ 29 The dissent relies on *Healy v. Bearco Management, Inc.*, 216 Ill. App. 3d 945 (1991). There we described the appellant's burden in prosecuting their appeal in the context of waiver for failing to include "argument or citation to authority." *Id.* at 958. No one claims Rouse's briefing or arguments are deficient in this way, so *Healy* has no bearing.

¶ 30 Invoking our authority to look past the State's waiver would be unjust under these principles. Rouse's petition made it to the second stage, so the State was a litigation participant in the trial court. This means the State has been aware of the substance of Rouse's arguments. Moreover, Rouse raised developed arguments about both prongs of *Strickland* in his opening brief. The State, on notice from the arguments about *Strickland* in the trial court and Rouse's brief, affirmatively decided to offer *no response* for two of his claims. We might have been inclined to

excuse the State's waiver had Rouse's briefing been inadequate or confusing or if the State failed to respond to a minor aspect of one of Rouse's arguments. Needless to say, a party may narrow the scope of a dispute by waiving elements on which their opponent would otherwise bear the burden of persuasion.

¶ 31    We see no reason to excuse the State's waiver of deficiency and prejudice under *Strickland* for Rouse's claims of ineffective assistance as to his right to a jury trial and right to testify. Similarly, we will hold the State to its waiver of argument under *Knapp* as to Rouse's ineffectiveness claim related to his right to testify. We analyze Rouse's claims against the arguments the State properly made.

¶ 32                                      *Impeding Right to a Jury Trial*

¶ 33    Rouse first argues his counsel prevented him from exercising his right to a jury trial. He claims she told him she would withdraw if he chose to a jury trial. As to prejudice, Rouse contends that trial counsel's conduct created a false choice between a bench trial at which he would have counsel and a jury trial at which he would have to represent himself; in other words, counsel's actions caused him to choose a bench over a jury trial.

¶ 34    Importantly, as we mentioned, the State makes no argument contesting Rouse's claims of deficiency and prejudice and, therefore, waives any claim that Rouse did not make a substantial showing of a constitutional violation under *Strickland*. The State only responds that the record positively rebuts Rouse's claim. We disagree.

¶ 35    The State relies heavily on *Knapp*, 2020 IL 124992, which held that the trial court's admonishments can positively rebut a claim that a defendant received bad advice from counsel before waiving the right to testify. See *id.* ¶¶ 52-54. In *Knapp*, however, there was a one-to-one relationship between the content of the trial court's admonishments and the alleged deficient

advice counsel offered. The petitioner alleged that counsel misadvised him, during multiple conversations about his decision to testify, that his testimony would have to be supported by corroborating evidence. *Id.* ¶¶ 33-34. Counsel then failed to tell him that the decision whether to testify belonged exclusively to him. *Id.* ¶ 34. The trial court admonished the defendant before he waived his right to testify and expressly asked whether he "underst[oo]d that the right to testify is a decision that [he] and [he] alone have the right to make." (Internal quotation marks omitted.) *Id.* ¶ 26. The defendant confirmed he understood. *Id.*

¶ 36     The trial record and Rouse's postconviction allegations do not similarly match. Critically, three of Rouse's factual allegations from his affidavit state (i) his counsel advised him to take a bench trial, (ii) his counsel told him she would withdraw if he did not take a bench trial, and (iii) he believed he had to follow his counsel's advice because he had never gone to trial before. The trial court's admonishment, unlike the admonishments in *Knapp*, did not include an attempt to help Rouse understand that choosing between a bench trial and a jury trial involved a decision only he could make. See, *e.g.*, *People v. Clendenin*, 238 Ill. 2d 302, 318 (2010) (listing "whether to waive a jury trial" as one of rights belonging exclusively to defendant). The court in *Knapp* focused heavily on the defendant's acknowledgment that "the decision *** to testify was his alone." *Knapp*, 2020 IL 124992, ¶ 54. Because the trial court's admonishments did not similarly cover the exclusive nature of Rouse's decision to choose between a bench trial and jury trial, his claim that counsel's advice pressured him to choose a jury trial is not rebutted by the record. We do not decide whether the trial court's admonishments were complete or proper—that is irrelevant. We

ask whether they encompassed the information Rouse claims he did not know, which is the only way the State could invoke the record to rebut his claim.

¶ 37    The dissent defends the trial court's admonishments as sufficient, saying we "engraft a requirement that a trial court must specifically admonish a defendant that the decision of choosing a bench or jury trial is exclusively [a] defendant's." *Infra* ¶ 80. We do no such thing. We stated the accuracy or completeness of the admonishments is irrelevant. But, as the dissent itself acknowledges, the content of the admonishments is relevant to determine whether the record rebuts Rouse's claim. A key aspect of the claim is that Rouse did not know he could contradict counsel's authority and insist on a jury trial. Our point about the trial court's admonishments is simply that, because the admonishments did not cover Rouse's exclusive authority to choose a jury trial (whether they had to or not), the admonishments cannot rebut his claim.

¶ 38    The State does not focus on, indeed does not acknowledge, the trial court's admonishments. Instead, the State construes Rouse's allegations about counsel's statements to him as a "threat" and argues the trial court's admonishments covered threats and promises. This argument ignores the liberal construction we must give Rouse's allegations at the second stage. Rouse alleged that "it's because of [his] attorney['s] authority that [he] elected to take a bench trial" and his lack of experience with trial procedure led him to "believe[ his] attorney to the utmost." Liberally construing Rouse's petition, he does not allege that counsel "threatened" him; rather, he alleges that he did not know that he could go over his counsel's head and choose a jury trial when she insisted on a bench trial. Again, the trial court's admonishments did not cover—and, therefore, did not cure—Rouse's misperception.

¶ 39    The dissent explains why Rouse's allegations show his attorney threatened him in a way that Rouse should have understood as covered by the trial court's admonishments. In reaching this

conclusion, the dissent cherry-picks one word, "forced," from Rouse's petition. The dissent does so to support its position that Rouse understood counsel's words to be a "threat." But Rouse expressly alleges he did not understand the trial court's admonishments to cover counsel's behavior:

> "The record in this case will reflect that the Court admonished [Rouse] of this right [to a jury trial] and the waiver thereof. What [Rouse] wasn't aware of during said admonishments, was the fact that he could have brought it to the attention of the Court defense counsel's *admonishment* that she would withdraw if he chose[ ] a jury trial."

First, this passage shows Rouse used varying language, including the word "admonishment," to describe counsel's words, language that sounds much less like a threat. Second, and most important, Rouse explains he did not understand the trial court's admonishments to cover counsel's statements.

¶ 40    As we have said, Rouse's interpretation of the court's admonishments and counsel's conduct is reasonable. The dissent can only reach the contrary conclusion by giving Rouse's allegations their narrowest meaning and construing them against Rouse. Maybe the dissent will be vindicated and its interpretation will be right, but the trial court—at the *third* stage—decides whether Rouse's interpretation of the court's admonishments is credible. See *People v. Allen*, 2015 IL 113135, ¶ 45. The dissent takes this task on itself; a task we should not undertake at this stage of postconviction review. *Id.*

¶ 41    The State and dissent also rely on *People v. Mabrey*, 2016 IL App (1st) 141359, which we distinguish on the same grounds as *Knapp*. The defendant claimed that police officers coerced his confession and he could not testify about their coercion at trial because another suspect in the crime had threatened him not to testify. *Id.* ¶ 43. We found the defendant's claim rebutted by the record

because the trial court confirmed on the record no one had threated the defendant about testifying and the decision belonged to him alone. *Id.* Because Rouse's claim does not rest on characterizing counsel's statements as "threats," we find *Mabrey* distinguishable because the trial court's admonishments did not cover the conduct of Rouse's counsel.

¶ 42    For completeness' sake, we recognize that this division recently (though not unanimously) applied *Knapp* in *People v. Paige*, 2022 IL App (1st) 200746-U. Accepting for the sake of argument that *Paige* was correctly decided, it is also distinguishable. Like the defendants in *Knapp* and *Mabrey*, the defendant in *Paige* alleged that trial counsel never told her she had a fundamental right to testify. *Id.* ¶ 39. The trial court, however, told her she had a fundamental right to testify and that only she could decide whether to do so. *Id.* These same admonishments are missing from the trial court's admonishments to Rouse and so, unlike *Paige*, the admonishments fail to cover the deficient performance Rouse alleges.

¶ 43    The State waived any argument that Rouse failed to meet the elements of his *Strickland* claim related to his right to a jury trial. The dissent apparently perceives some hypocrisy based on the unpublished decision in *People v. Bell*, 2016 IL App (1st) 140647-U, where a member of this majority previously found a similar claim failed because choosing between a bench and jury trial is a traditional matter of trial strategy. *Id.* ¶ 59. For what it is worth, *Bell* is distinguishable. There, despite alleging he felt "forced" into a bench trial by private counsel's statement they would withdraw if he took a jury, the record showed the defendant later felt comfortable firing private counsel and relying on the public defender. *Id.* ¶ 57. This additional fact rebutted the defendant's

claim. No such additional facts exist here. Moreover, the dissent should not have cited Bell because the parties would be unable to do so. See Ill.S.Ct.R. 23(e) (eff.Jan.1, 2021).

¶ 44 But the State did not defend trial counsel's statements as grounded in strategy and for reasons we have discussed at length, we hold the State to its waiver. We reverse the trial court's dismissal of this claim and remand for an evidentiary hearing.

¶ 45                                    *Impeding Right to Testify*

¶ 46 Rouse next argues he made a substantial showing that trial counsel was ineffective for failing to prepare him to testify, which prevented Rouse from exercising his right to testify. He claims counsel's deficiency prejudiced him because the court never heard the noncriminal reasons that he possessed $3000: to pay traffic fines. As before, the State makes no argument challenging Rouse's assertion of deficiency and prejudice under *Strickland*. In an attempt to rehabilitate the State's waiver, the dissent imports the State's *Strickland* arguments against Rouse's claims at other points in its brief as if made in the section dealing with Rouse's right to testify. But, at the second stage, we evaluate the merits claim by claim. See *People v. Logan*, 2011 IL App (1st) 093582, ¶ 58. The State makes one argument: Rouse's petition does not adequately plead a failure-to-prepare claim. We disagree. Construing Rouse's petition liberally, as we must, we find sufficient support in his pleadings to justify an evidentiary hearing.

¶ 47 The caption to this portion of Rouse's petition states he was denied the effective assistance of counsel "where trial counsel's failures prevented [him] from testifying." After explaining the trial court's on-record admonishments about his right to testify, he alleges counsel had an off-record conversation during which she told him: "if he testified it would make her look bad because *she didn't go over what his testimony would be*." (Emphasis added). Counsel then doubled down and told Rouse that "he needed to go along with her on this." Rouse also cited at least one case

- 17 -

with a substantial discussion of counsel's ineffectiveness for failing to prepare a defendant for her testimony. See *Jones v. Jones*, 988 F. Supp. 1000, 1006-07 (E.D. La. 1997). Rouse then repeated his major factual premise in his affidavit.

¶ 48      Aside from repeatedly stating that "no such claim was raised in [Rouse]'s *pro se* petition," the State does not point to a specific deficiency in the petition that would warrant a conclusion that Rouse failed to adequately raise this claim. Liberally construing Rouse's petition, his claim is that trial counsel prevented him from exercising his right to testify by failing to prepare him and by telling him that he had to go along with her to prevent embarrassing her. Because we agree that Rouse's petition sufficiently presented the claim, we need not address his argument that postconviction counsel provided unreasonable assistance by failing to preserve it.

¶ 49      The State makes much that Rouse's opening brief "conced[es]" his petition "did not spell out the failure-to-prepare claim unambiguously." The State takes this selective quotation from a section of Rouse's brief dedicated to the *alternative* argument that postconviction counsel provided unreasonable assistance by failing to sufficiently allege the failure-to-prepare claim in the event this court construed the petition as forfeiting the claim. In the paragraph immediately preceding the State's quotation, Rouse's brief says, "Rouse maintains that his *pro se* amended petition, which alleged (among other things) that trial counsel's failure to consult adequately with defendant amounts to ineffectiveness of counsel, sufficiently raised the failure-to-prepare claim." (Internal quotation marks omitted.) Reading Rouse's argument in context shows he did no more than make an alternative argument should this court adopt an unfavorable construction of his petition.

¶ 50      Again, the State has waived the argument that Rouse has not made a substantial showing of the two elements of his *Strickland* claim as it relates to his right to testify. Because we have

rejected the State's only argument in favor of affirming, we reverse the second stage dismissal of this claim and remand for an evidentiary hearing.

¶ 51                              *Failure to Call Rouse's Sister*

¶ 52    Finally, Rouse claims trial counsel knew Rouse's sister was available to testify that "the money the victims claimed belonged to them was not, in fact, proceeds of the robbery." Rouse argues he was prejudiced because the State's case suffered from weaknesses—the victims' identifications were based on a "necessarily suggestive one-man show-up," Rouse had one of the cell phones from the robbery, and the gun had fingerprints on it that did not belong to Rouse. He compares the State's testimony with his and his sister's affidavits —the money officers found on Rouse belonged to him and the cell phone officers claimed to have found on him was brought back to the scene from somewhere else.

¶ 53    The State does not separate its responses into the deficiency and prejudice prongs of *Strickland*. That said, it appears the State argues that counsel did not perform deficiently because (i) Rouse's sister never averred she was willing to testify, and (ii) Rouse's sister did not have personal knowledge of the source of the money. The State then argues Rouse cannot have suffered prejudice from a claimed deficiency because the State's case was too strong for her testimony to impact the outcome.

¶ 54    Before addressing the State's arguments, we note the dissent implies we should presume the trial court ruled correctly because the petition is missing a page relating to Rouse's *Strickland* claim about his sister's testimony. *Infra* ¶ 96 (citing *People v. Kirkpatrick*, 240 Ill. App. 3d 401, 406 (1992) ("any doubt arising from incompleteness of the record will be resolved against the appellant")). But the missing page does not create any doubt to resolve. We know from the trial court's order dismissing the petition that Rouse raised a *Strickland* claim for counsel's failure to

call his sister. And the trial court's order gives us the essential element of the claim: "Petitioner contends that his sister would have testified that petitioner left his house that morning with a large sum of cash." We also know the factual basis for this claim from Rouse's affidavit and his sister's affidavit. Simply put, the missing page does not instill doubt as to the nature of Rouse's claim, so we will address it on the merits.

¶ 55    We reject the State's first argument and conclude that, construing Rouse's petition liberally, his sister would have testified. We acknowledge, as the State argues, that Rouse's sister's affidavit does not say she would be willing to testify. But Rouse averred in his own affidavit that his sister "w[as] able to verify the fact that [he] had the money prior to leaving home that day." The State has not cited, and we have not found, cases requiring a potential witness's affidavit to expressly say they would be willing to testify. Crucially, the Illinois supreme court has said the opposite. *Allen*, 2015 IL 113135, ¶ 41 (rejecting argument that petitioner's claim fails because affidavit "does not indicate [a witness] would testify to the facts therein"). While *Allen* was a first-stage case, our obligation to construe the petition liberally (see *id.*) carries over to second-stage review. Taking Rouse's affidavit, together with his sister's affidavit, we find the petition makes a sufficient showing that his sister would have been available to testify to the facts in her affidavit had counsel called her.

¶ 56    For similar reasons, we are unpersuaded by the dissent's concern that Rouse never told his counsel his sister would testify. Paragraph 4 of Rouse's affidavit says:

"That I informed my attorney that I had the money in my pocket *** because I owed multiple fines for driving with [a] suspended license and that on the date that I [was] arrested I brought proof of insurance for the vehicle I was driving so the Court threw out the fine that I thought I would receive. That I w[as] on my

way to Dekelb (*sic*) via public transportation when I was stopped by officers who
eventually took the money I had. That my sister w[as] able to verify the fact that I
had the money prior to leaving home that day."

Though the sentences are broken up by periods and not semi-colons, they all start with the word "that." Thus, the paragraph can reasonably be read as a list of things Rouse told his counsel. Because this construction is reasonable, we can infer (at least at this stage) that Rouse told his counsel his sister would testify.

¶ 57    The State cites *People v. Wallace*, 2015 IL App (3d) 130489, ¶ 29, for the proposition that Rouse's sister's affidavit is insufficient because it contains hearsay. But our supreme court recently overruled *Wallace* on that exact point. *People v. Robinson*, 2020 IL 123849, ¶ 78 (rejecting reliance on *Wallace* and other cases decided before amendment to Illinois Rule of Evidence 1101(b)(3) (eff. Apr. 8, 2013), exempting postconviction hearings from the rules of evidence). Even if the portion of Rouse's sister's affidavit relaying the words he spoke to her were ultimately inadmissible, there is enough corroboration in her affidavit. For example, her affidavit explains that she saw Rouse leave the house and before he did so she asked if he needed "all that money." Even without Rouse's verbal response, his sister's affidavit (construed liberally) suggests she saw the money he had and it was enough money for her to comment on it. Her affidavit also does not have to stand on its own. For our purposes, we need to ask whether it corroborates Rouse's claims and the facts alleged in his affidavit, and it does.

¶ 58    The dissent levels one other attack on Rouse's and his sister's affidavits, calling them "self-serving." *Infra* ¶ 95. Our supreme court has rejected the State's attempts to make similar arguments, saying "the mere fact that an affidavit serves the defendant's interests does not render it inherently incredible." *People v. Chambers*, 2016 IL 117911, ¶ 83. It would be surprising for a

defendant to submit an affidavit that did not serve his or her own aims. *Id.* ("a defendant is highly unlikely to submit an affidavit that undermines his [or her] position"). And, as our supreme court's language suggests, describing an affidavit as "self-serving" is a credibility determination, which is reserved for third-stage review.

¶ 59    We turn then to the State's most noteworthy argument—that Rouse's sister's affidavit would not have impacted the outcome due to the strength of the trial evidence. At the outset, we underscore the difficulty squaring this argument of the State's with its failure to challenge *Strickland*'s prejudice prong as it relates to Rouse's own testimony. Though we will not impute the State's concession as to Rouse's testimony onto its argument about his sister's testimony, the two relate inextricably because his sister's testimony served primarily to corroborate his.

¶ 60    We find prejudice in the context of a *Strickland* claim "where there [is] a reasonable probability that *** the result of the proceedings would have been different" had counsel performed adequately. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45. Prejudice emerges " 'even when the chance that minimally competent counsel would have won an acquittal is "significantly less than 50 percent," as long as a verdict of not guilty would be reasonable.' " *Id.* (quoting *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008), quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)). The dissent takes issue with the word "significantly" from *Lucious* by quoting *McCarter*. But the cases the dissent offers in response do not require a defendant raising a *Strickland* claim to prove it by a preponderance of the evidence. *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006) ("reasonable chance" of acquittal "needn't be a 50 percent or greater

chance"). Whether "significantly" less or merely less than 50%, we need only find our confidence in the outcome undermined. *Id.*

¶ 61    Trial counsel's theory disputed identification. She attacked the show-up as suspect. See *In re T.B.*, 2020 IL App (1st) 191041, ¶ 40 ("courts have long recognized the inherent suggestiveness of show-up procedures, no matter how properly the police acted"). The officers' testimony also suffered from inconsistencies. For example, when Wenta found Rouse in an alley, he said Stanley was behind Rouse with his gun pointed at him, but Stanley testified that he was busy retrieving the gun the offender threw and then immediately went north in the alley where he saw Wenta arresting Rouse. Stanley never testified that he drew his gun. Also, neither officer saw the offender for the entirety of the chase. Stanley stopped chasing the offender when he threw the gun, and Wenta drove around to a parking lot where he apprehended Rouse. But Wenta was not part of the foot chase. The State points out the proceeds of the robbery, but Rouse's affidavit provides a contrary explanation. He denied possessing a cell phone, and he offered a noncriminal reason for possessing the money.

¶ 62    The dissent says we have overblown these inconsistencies. That is no more than a credibility determination in disguise—the officers' account is more credible than Rouse's. We do not refer to the inconsistencies in the officers' testimony to suggest they should not have been believed (especially given the lack of contrary evidence before the fact finder at trial). Rather, we raise these weaknesses in their testimony to show that there is a triable issue of fact about the degree of prejudice Rouse suffered by failing to have his testimony and his sister's testimony before the judge.

¶ 63    Notably, trial counsel tried to argue in closing that Rouse possessed his own money: "These individuals are not clear about how much money they had on them; and for the State then to argue,

well, it's the same money that was found on Mr. Rouse, how do you know that? How do you know that Mr. Rouse didn't have money on him? It's not illegal for him to have his own money on him." Counsel attempted this strategy without evidence to back up her speculation; evidence we now have in the form of Rouse's and his sister's affidavits.

¶ 64    At this stage of postconviction proceedings, the allegations in Rouse's petition essentially create a credibility contest. The State has show-up identifications and the proceeds of the robbery; Rouse denies involvement, challenges the identifications as suspect, and explains why he had money on him. At this stage, we do not weigh the relative credibility of these accounts, and ties go to the allegations in the petition. See *Coleman*, 183 Ill. 2d at 382 (we interpret allegations in petitions liberally). Applying a liberal construction and taking his factual allegations as true, Rouse has made a substantial showing that there is at least a "significantly less than 50 percent" chance the outcome would have been different had counsel called him and his sister to testify.

¶ 65    The dissent concludes by accusing us of abusing the liberal pleading standards for second-stage petitions by "cobbling together a petition for the defendant's benefit." Frankly, the dissent's accusation is hard to take when the dissent has taken it on itself to spend pages making arguments the State chose not to make against two of Rouse's claims. And the dissent's concern about overindulging liberal pleading standards does not give it license to do the opposite: ignore them. At every turn, the dissent gives Rouse's claims their least charitable construction, decides the allegations are not worthy of belief, or concludes they cannot be credible because the State mustered contrary evidence at trial. None of those considerations are for us to make—they are for the trial court to make at an evidentiary hearing.

¶ 66    In sum, we reverse the trial court's dismissal and remand for an evidentiary hearing on Rouse's claims of ineffective assistance of counsel as they relate to (i) counsel's failure to prepare

and present Rouse's testimony, (ii) counsel's interference with Rouse's right to a jury trial, and (iii) counsel's failure to call Rouse's sister to testify.

¶ 67    Reversed and remanded.

¶ 69    PRESIDING JUSTICE LAVIN, dissenting:

¶ 70    Because I do not believe defendant has demonstrated a substantial showing of a constitutional violation, I would affirm the circuit court's dismissal of defendant's petition on the State's motion, and I respectfully dissent.[1]

¶ 71    Although unclear from the majority opinion, I would first note that a postconviction petitioner is not entitled to an evidentiary hearing as a matter of right (*People v. Coleman*, 183 Ill. 2d 366, 381 (1998)), and at the second stage of postconviction proceedings, "the *defendant bears the burden* of making a substantial showing of a constitutional violation." (Emphasis added). *People v. Allen*, 2015 IL 113135, ¶ 21; see *People v. Domagala*, 2013 IL 113688, ¶ 35 (same). "If

---

[1]It is worth clarifying what defendant's "postconviction petition" encompasses. Here, defendant filed his *pro se* postconviction petition on August 2, 2013, raising claims that he was not adequately informed of his sentence and challenging his show-up identification. Defendant alleged due process violations and ineffective assistance of counsel. Defendant attached a detailed affidavit essentially explaining why he was carrying a large amount of cash ($3000 for a traffic fine) and explaining his subsequent travel from the Markham courthouse to downtown Chicago, where police accosted him and then took him to the scene, essentially planting evidence on him. Defendant also attached his sister's handwritten affidavit basically averring that defendant was carrying a large amount of money to pay traffic fines that morning.

This petition proceeded to the second stage, where defendant was appointed counsel. On September 29, 2016, defendant filed his amended *pro se* petition, containing the allegations that are currently at issue on appeal. This petition was the focus of proceedings below. Defendant attached an "amended sworn affidavit," wherein he attested more specifically to the claims he was raising in his amended petition (such as regarding the jury waiver issue). He also attested that he had informed defense counsel about the cash he carried on the day of his arrest and then he significantly condensed the exonerating facts from his previous affidavit.

Also on September 29, 2016, postconviction counsel filed an Illinois Supreme Court Rule 651(c) (eff. Jan. 1, 1967) certificate, stating "I have made no amendments to the [*sic*] either *pro se* Petition previously filed or the Amended Petition as both *pro se* Petitions are sufficient for the adequate presentation of Petitioner's contentions." At the second-stage, defendant's petition thus consisted of the amended *pro se* petition, which incorporated the previously filed *pro se* petition. The majority opinion does not make clear that the "petition" encompasses both *pro se* filings and both of defendant's affidavits, plus that of his sister.

the *defendant has carried his burden* to make a substantial showing of a constitutional violation *throughout the second stage*, the court advances the petition to the third stage." (Emphases added). *Allen*, 2015 IL 113135, ¶ 22. To do so, the allegations in the petition must be supported by the record in the case or by accompanying affidavits. *Coleman*, 183 Ill. 2d at 381; see *Allen*, 2015 IL 113135, ¶ 43 (the attached evidence must show the petition's allegations are capable of objective and independent corroboration and identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations). Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act. *Coleman*, 183 Ill. 2d at 381. Moreover, under our plenary review, this court must make its own independent assessment of the petition's allegations in order to formulate the legally correct answer. *Id.* at 388. Nothing in our postconviction jurisprudence allows the reviewing court to ignore the record. *People v. Knapp*, 2020 IL 124992, ¶ 54.

¶ 72    As to *Strickland v. Washington*, 466 U.S. 668 (1984), it is similarly the defendant who bears the burden of showing that counsel's performance was deficient and that this deficient performance prejudiced the defense. *Id.* at 687-89, 693 ("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness," and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy,' " and, further, generally "the defendant [must] affirmatively prove prejudice."); see *People v. Tate*, 2012 IL 112214, ¶ 19 (noting, at the second stage of postconviction proceedings, a defendant is required to " 'demonstrate' or 'prove' ineffective assistance by 'showing' that counsel's performance was deficient and that it prejudiced the defense," in contrast to the first-stage where the standard is "arguable").

¶ 73    The majority, however, turns these principles on their head and essentially shifts the burden to the State under the guise of forfeiture. Unfortunately for defendant and the majority, these are not the rules. The majority fails to cite a supreme court case holding that the State's forfeiture of an argument entirely eliminates the defendant's burden of establishing an error in the first place. See *supra* ¶ 27; *cf. People v. Holloway*, 86 Ill. 2d 78, 91 (1981) (finding the State forfeited the assertion that the codefendant lacked standing to challenge a warrantless entry where the State failed to raise the matter in the trial court and the codefendant could have conceivably established a possessory interest in the premises if the State had done so). Moreover, the majority confuses the claimed deficiencies in the State's brief for concessions. See *supra* ¶ 60. Here, having reviewed the record and parties' briefs, it is clear that defendant cannot sustain his burden under the Act, under *Strickland*, or as the appellant. See *People v. Jefferson*, 2021 IL App (2d) 190179, ¶¶ 37, 48 (a court has the authority to recognize, unassisted by the appellee, an obvious lack of merit in a briefed issue, and a defendant, notwithstanding any forfeiture by the State, has the burden to affirmatively show error); see also *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-33 (1976) (the burden of persuasion remains with the appellant despite the appellee's failure to file a brief); *Healy v. Bearco Management, Inc.*, 216 Ill. App. 3d 945, 958 (1991) ("The party prosecuting the appeal bears the burden of showing affirmatively the errors assigned on review.").

¶ 74                              *Defendant's Jury Trial Claim*

¶ 75    First, as to defendant's jury waiver claim detailed in his petition, I agree with the State that this claim is rebutted by the record. See *Domagala*, 2013 IL 113688, ¶ 35. In his petition, defendant alleged that his counsel was deficient when she told him that "if Petitioner did not take a bench trial she would withdraw from representing him," and he was under the impression withdrawal

meant he would be representing himself. He alleged that it was "because of Counsel's Authority that Petitioner elected to take a bench trial." Yet, the record shows that prior to trial, after explaining to defendant the difference between a bench and jury trial, the court asked, "Did anyone threaten you or promise you anything to make you choose a bench trial?" See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/threat (last visited Nov. 16, 2022) [https://perma.cc/5LJB-ZX3S] (defining "threat" as "an expression of intention to inflict evil, injury, or damage," "one that threatens," "an indication of something impending"). Defendant responded "No," and the court then verified "You're choosing the bench trial of your own free will?" Defendant responded, "Yes, sir," and further signed the written jury waiver form.

¶ 76    On this record, defendant thus verified that it was his free will (and not that of his attorney) to take the bench trial and, moreover, that no one had threatened him into making that choice. Although defendant asserted in his petition that he was unaware he "could have brought [his allegations] to the attention of the trial court," as he had never been to trial before, the trial court clearly presented him with such an opening during the aforementioned colloquy. Moreover, defendant was no stranger to the criminal justice system, having been convicted in 2008 of aggravated discharge of a firearm. Around the time of this case, he also had a felony drug possession case pending, for which he was later convicted. Likewise, nowhere did defendant allege that *counsel* told him he would be representing himself if she withdrew, gutting any claim of deficiency in that regard. Indeed, he was represented by a public defender; had his counsel withdrawn, defendant would have been assigned another public defender. Thus, defendant's postconviction claim in support of ineffectiveness qualifies as textbook record rebuttal. See *People v. Blalock*, 2022 IL 126682, ¶¶ 48-49; *People v. Mabrey*, 2016 IL App (1st) 141359, ¶¶ 14, 43; *cf. Knapp*, 2020 IL 124992, ¶ 54.

¶ 77    The majority nevertheless maintains the allegation—"if Petitioner did not take a bench trial she would withdraw from representing him"—could be construed as an admonishment, rather than a threat, thus falling outside of the ambit of record rebuttal. Given defendant's characterizations in his petition, before the postconviction court, and on appeal, I cannot agree. In his petition, defendant wrote that defense counsel's "short-comings" included "*forcing* defendant to take a bench trial" (emphasis added), and he cited an appellate court case similarly reflecting a defendant's forced choice. As noted by the State during oral arguments, in defendant's response to the State's motion to dismiss the petition below, defendant contended that his "counsel *threatened* to withdraw if he did not agree to a bench trial," (emphasis added) and asserted the central issue was whether defendant's jury trial waiver was understandingly and knowingly made (and, thus, not ineffectiveness!). Postconviction counsel thus abandoned characterizing the statement of defendant's trial counsel as an admonishment.

¶ 78    Even in defendant's opening appellate brief, he asserts that trial counsel "coerced" him "into choosing a bench trial," rendering ineffective assistance. See Appellant's Brief, pages 16 and 18 ("had counsel not coerced [defendant] into waiving his right to a jury, he would have exercised that right"); see also Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/coerce (last visited Nov. 10, 2022) [https://perma.cc/BYP5-KBYQ] (defining "coerce" as "to compel to an act or choice," "to achieve by force or threat," "to restrain or dominate by force"). While he later backtracks from this representation, it remains prominent in his brief. Under the doctrine of invited error, a defendant may not request to proceed in one manner and later contend that the course of action was in error. See *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17.

¶ 79    Regardless, these characterizations all qualify as admissions that defendant's principal allegation involved *a threat.* See *Bank of Chicago v. Park National Bank*, 277 Ill. App. 3d 167, 172 (1995) ("A judicial admission is a deliberate, clear, unequivocal statement of a party regarding a concrete fact within the party's peculiar knowledge and is conclusive upon the party making it, thereby relieving the opposing party from presenting any evidence."); see also *Jordan v. Knafel*, 355 Ill. App. 3d 534, 544 (2005) (a court may consider judicial admissions in the record when ruling on a motion to dismiss); *Bauer v. Saper*, 133 Ill. App. 2d 760, 762 (1971) (noting, an attorney can make admissions that are binding on his client).[2] At the very least, they represent allegations that are not well-pled and so do not merit further attention from any court. See *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). For these reasons, defendant failed to fulfill his burden of showing a substantial constitutional violation as to the jury waiver issue.[3]

¶ 80    It bears noting that, here, the admonishments of the trial court are relevant to measure whether the record rebuts defendant's claim that *his counsel was ineffective*, *i.e.*, deficient for threatening him and depriving him of choice, which essentially made his waiver involuntary. In an effort to establish that defendant's allegations were *not* rebutted by the record, the majority relies on *Knapp* and appears to engraft a requirement that a trial court must specifically admonish

---

[2]General civil practice rules and procedures apply to the extent they do not conflict with the Act. *People v. Bailey*, 2017 IL 121450, ¶ 29.

[3]I find it noteworthy that a very similar issue was raised in *People v. Bell*, 2016 IL App (1st) 140647-U, where the defendant argued he was "coerced into foregoing a bench trial when his attorney threatened to withdraw if the defendant did not select a jury trial." *Id.* ¶ 53. The authoring judge, who is also a member of the present panel, concluded the defendant failed to make a substantial showing of ineffective assistance of counsel because "this case falls within the scope of cases in which an attorney's advice on whether to take a bench or a jury trial constitutes trial strategy." *Id.* ¶ 59. The court also concluded in a rather circular fashion that the attorney's statements did not force defendant to take a jury trial: "Even assuming that counsel would have followed through and actually withdrawn from the case had the defendant elected a bench trial, the defendant would still have been afforded his right to a bench trial. At no point was he deprived of that option." *Id.* ¶ 57. Additionally, the court made a credibility finding that the defendant was not believable because he later fired his private counsel at sentencing. These conclusions are seemingly at odds with the present opinion.

a defendant that the decision of choosing a bench or jury trial is exclusively defendant's. Notably, however, *Knapp* was a right to testify case. While the right to testify and the right to a jury trial are similar (they are both fundamental constitutional rights and solely up to the defendant), the admonishments a court must issue to ensure voluntariness are different. See *Knapp*, 2020 IL 124992, ¶ 46; *People v. Bracey*, 213 Ill. 2d 265, 269 (2004); *People v. Ramey*, 152 Ill. 2d 41, 54 (1992).

¶ 81    For jury waiver, a trial court is not required to provide any particular admonition or information regarding that right. *People v. Bannister*, 232 Ill. 2d 52, 66 (2008). And, whether the jury waiver is valid "cannot be determined by application of a precise formula, but rather turns on the particular facts and circumstances of each case." *Bracey*, 213 Ill. 2d at 269. What is pivotal to the defendant's understanding, when waiving the right to a jury trial, is that the facts of the case will be determined by a judge and not a jury. *Bannister*, 232 Ill. 2d at 69. Defendant bears the burden of establishing that his jury waiver was invalid. *People v. Foster*, 2022 IL App (2d) 200098, ¶ 29. Here, for the reasons already stated, the admonitions by the trial court ensured that defendant's jury waiver was knowing and voluntary and not based on any allegedly erroneous advice by counsel. *Cf. Knapp*, 2020 IL 124992, ¶ 54.

¶ 82                              *Defendant's Right to Testify Claim*

¶ 83    Second, as to defendant's contention that his trial counsel's lack of preparation impeded him from testifying, the majority maintains that defendant is entitled to an evidentiary hearing because the State failed to argue *Strickland* in its appellate brief. This is incorrect. While the State could have been more articulate in arguing the matter specifically as to the right to testify claim, the State's brief at the outset identifies the *Strickland* standard and later maintains defendant cannot establish a substantial showing of prejudice. Significantly, defendant's appellate counsel conceded

at oral argument that notwithstanding any forfeiture by the State, this court would still need to find *prejudice* under *Strickland* for a reversal. Again, the burden of establishing *Strickland* prejudice under the Act is on defendant. See *People v. Lewis*, 2022 IL 126705, ¶ 46 ("*Strickland* requires a defendant to 'affirmatively prove' that prejudice resulted from counsel's errors.").

¶ 84    Defendant, however, fails to sustain that burden. In the amended petition, itself, defendant states, "In order to not provide the State with too much information that would prepare them for the cross-examination of Petitioner after he testify [*sic*]; Petitioner preserves the right to later give this Honorable Court a detail [*sic*] statement of what his testimony would have been during his testimony." This failure to identify what his trial testimony would have been defeats any claim that he was prejudiced by the absence of that testimony. See *People v. Barkes*, 399 Ill. App. 3d 980, 989-90 (2010); *People v. Dupree*, 2018 IL 122307, ¶ 37 ("there can be no substantial showing of ineffective assistance of counsel for failure to investigate or call a witness if there is no evidence that the exculpatory evidence actually exists"). Prejudice under *Strickland* cannot be based on "mere conjecture or speculation." (Internal quotation marks omitted.) *People v. Johnson*, 2021 IL 126291, ¶ 58. To the extent defendant's detailed affidavit attached to his initial *pro se* petition or the condensed version attached to his amended petition can be construed as potential testimony, I find it is contradicted by the aforementioned averment in his amended petition. At the very least, the ineffectiveness claim does not appear well-pled. See *Pendleton*, 223 Ill. 2d at 473; see also *Dupree*, 2018 IL 122307, ¶ 31 (noting, a postconviction petitioner must clearly set forth the respects in which his constitutional rights were violated and shall have attached affidavits or other evidence supporting his allegations). Given that defendant had counsel at second-stage proceedings, it is not the responsibility of this court to "infer necessary facts that the defendant has failed to allege." *People v. Clinton*, 2016 IL App (3d) 130737, ¶ 31.

¶ 85    More importantly, even construing defendant's factual averments in his affidavits as true, he still fails to make a substantial showing of *Strickland* prejudice. See *Barkes*, 399 Ill. App. 3d at 989-90. In them, defendant stated that he informed his trial attorney he had $3000 cash in his pocket due to owing multiple fines for driving with a suspended license because he went to traffic court in Markham on the day of his arrest, having also brought proof of insurance. He averred that the fine was thrown out and that he was basically on his way downtown when police stopped him and took his money. He claimed he did not go to the hot dog stand, rob anyone, or possess a gun. Instead, officers grabbed him as he was walking down the street, bringing him to the show-up and officers then "told the victims they found [the] property on me when they actually found it in an alley."

¶ 86    While our task at the second stage of proceedings is not to make factual findings or credibility determinations (*People v. Sanders*, 2016 IL 118123, ¶ 42; *Domagala*, 2013 IL 113688, ¶ 35), we still must decide whether there is a reasonable probability that, but for defense counsel's unprofessional errors (here, precluding defendant's testimony), the outcome of the proceeding would have been different. See *Dupree*, 2018 IL 122307, ¶ 44; see also *Allen*, 2015 IL 113135, ¶ 45 (suggesting the second stage requires a more probing inquiry); *Tate*, 2012 IL 112214, ¶¶ 21-22 (same). The majority maintains that *Strickland* prejudice occurs " ' "even when the chance that minimally competent counsel would have won an acquittal is '*significantly less than 50 percent*,' as long as a verdict of not guilty would be reasonable." ' " (Emphasis added). See *supra* ¶ 61; *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45 (relying on *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008)). Notably, this rule emerged from *McCarter*. In turn, *McCarter* relied on *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001), which has long since been vacated. See *Miller v. Anderson*, 268 F.3d 485 (7th Cir. 2001).

¶ 87    Regardless, a reading of *Strickland* and its progeny reveals the rule to be inaccurate. In *Strickland*, our United States Supreme Court wrote: "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 694. Stated differently, the result of a proceeding can be rendered unreliable even if a defendant fails to establish that it is more likely than not that his counsel's errors affected the trial outcome. Yet, the majority's holding—that a defendant can demonstrate a reasonable probability that the outcome would have been different even where that probability is *significantly less than 50%*—effectively guts *Strickland*.

¶ 88    Since *McCarter*, the Supreme Court has clarified that in assessing *Strickland* prejudice, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011); see *Lewis*, 2022 IL 126705, ¶ 46 (same). The *Harrington* court continued, noting "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' [Citation.] The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 111-12; *People v. Cross*, 2021 IL App (4th) 190114, ¶ 93.

¶ 89    Here, given the quantum of evidence and the internal consistency of the evidence offered against defendant, I do not believe his self-serving statements would have substantially changed the trial result. Notably, defendant has not offered any evidence corroborating his claim that he was in the Markham traffic court on the day of his arrest or that his hefty fines of some $3000 had been dismissed. He likewise failed to identify any inventory receipts, which would presumably show he had proof of insurance on his person when arrested. The arrest report reveals only that

cell phones, cash, and a gun were recovered from defendant on his arrest. At the second stage of proceedings, I would expect this easy-to-acquire evidence to be attached to the petition in corroboration.

¶ 90    Significantly, defendant's exculpatory statements are contradicted by four witnesses, who testified competently and consistently.[4] The two businessmen robbery victims had ample opportunity to observe defendant. Hangora testified that around 5 p.m. that November day, he spoke with defendant face-to-face for some two to four minutes at the hot dog stand. Ali stated the subsequent car ride took 15 to 20 minutes from beginning to end, and he was looking at defendant during that time.[5] Hangora also looked at defendant's face during the ensuing robbery, which took place in a parking lot at 1126 South Clinton Street. As noted, there, defendant pointed a gun at the two victims while ordering them to place their cell phones (one a Blackberry), the car keys, and cash (totaling between $2700 to $3000) in the center console. Both reported that defendant was wearing a baseball cap, gray jacket, and baggy jeans. Ali added that defendant was age 25, dark-skinned, and 5 feet, 9 inches. Arriving within minutes to this location at 5:40 p.m., police issued that description over their radio and soon thereafter were informed that a person matching it was seen running several blocks away on Clinton Street. Officers Stanley and Wenta testified that they drove northbound on Clinton Street and observed defendant running southbound away from another police officer in pursuit (Officer Villalobos, beat 130, who did not testify). Officer Stanley observed that defendant was wearing a baseball cap, a gray jacket, and baggy pants.

---

[4]Several pages from the report of proceedings involving this trial are missing.

[5]On direct examination, in response to the State's question of "how long were you driving in the car with the defendant directing you on where to go," Ali testified "[a]bout five minutes." However, on cross-examination, defense counsel asked how long the car ride lasted from when defendant entered until he exited the car, and Ali responded that it was 15 to 20 minutes, during which time Ali was "turning around and looking at" defendant.

¶ 91　The officers then testified consistently that defendant kept running down Clinton Street, turning first into a parking lot to the west, and then north into an alley. Officer Stanley pursued defendant on foot (getting within 10 to 15 feet of him) while his partner, Officer Wenta, followed in the police vehicle. The parking lot emptied into an alley, at which point Officer Stanley saw defendant attempting to throw his gun atop a building, although he missed.[6] Officer Stanley recovered this loaded silver revolver. Both officers then testified that defendant continued northbound in the alley but shortly thereafter was detained by Officers Wenta and Villalobos. In defendant's pocket, police found a Blackberry cell phone later identified as one of the victim's and $2995 matching the denominations described by the victims.

¶ 92　Some 10 minutes after this detention, while defendant sat in the squad car, both victims identified him as the perpetrator of the robbery, with Hangora noting he was wearing the same clothing as during the offense.[7] They also identified him in court. As noted, police, with the help of the fire department, found the other victim's cell phone atop the same building where defendant threw his gun. Before the police, the victims identified their property and also the revolver defendant held in their faces. The victims thus had the opportunity to view defendant, displayed close attention, provided an accurate description of defendant, and identified both defendant and his gun, apparently without hesitation and after a very short period. See *People v. Ramos*, 339 Ill.

---

[6]The majority makes much of the fact that around this time Officer Wenta observed Officer Stanley with his gun drawn, even though Officer Stanley did not testify to this fact. See *supra* ¶ 62. I note that Officer Stanley was never asked if he drew his gun. Regardless, it makes sense that a police officer who sees a suspect running down a dark alleyway with a gun drawn would draw his own gun. I do not think there is any discrepancy in the two officers' testimony, when read together.

　　The majority reads other inconsistencies into the trial record, which I do not think exist or are exaggerated. For example, while the majority asserts Officer Stanley did not see defendant for the entire chase, Officer Stanley testified he only lost sight of defendant for one to two seconds. Similarly, while it is unclear from the record whether Officer Wenta chased defendant in his vehicle the entire time or initially in his vehicle and then on foot, he was part of the chase. Officer Wenta saw defendant run into a parking lot and then north in an alley.

　　[7]When challenging the show-up as suggestive, defense counsel asserted that the show-up took place within 10 minutes of the armed robbery. The State agreed, and the parties stipulated to the facts.

App. 3d 891, 897-98 (2003) (noting the factors weighed to determine the independent reliability of an identification). The trial court, after noting defense counsel had "ably represented the defendant," found the witnesses "were excellent, every one of them" in what the court considered "an almost indefensible case."

¶ 93    Based on the foregoing, I do not believe that defendant's self-serving, conclusory statements that he was not the offender, that police took his money, and that they then found the victims' property in an alley reasonably would have affected the trial outcome in any significant degree. See *Coleman*, 183 Ill. 2d at 400. Defendant's theory that police planted the evidence on him cannot overcome the fact that the two disinterested victims identified him as the armed robber. Thus, my confidence in the outcome of trial is not at all undermined. See *Strickland*, 466 U.S. at 693. I also disagree with the majority's insinuation that the victims' identification of defendant was in any way invalid. While defendant before trial filed a motion to suppress the show-up procedure as unduly suggestive and therefore the identifications as unreliable, he lost. He did not challenge the show-up on direct appeal, and he does not legitimately challenge it now on appeal. As such, any claim of suggestiveness leading to misidentification should not factor into the analysis. See *Ramos*, 339 Ill. App. 3d at 897.

¶ 94                *Defendant's Claim of Ineffectiveness for Failure to Call His Sister*

¶ 95    For the reasons above and even taking defendant's statements in his affidavits as true (a point we should not even reach, as I have stated), I would find that defendant's self-serving allegations are not aided by more conclusory, self-serving allegations by his sister. His sister averred that she observed defendant carrying lots of money on the morning of his arrest.[8]

---

[8]This averment can only be inferred from liberally construing the affidavit. In it, defendant's sister says she spoke with her brother on the day in question and asked if he "need[ed] all that money Just for some fines." She stated he left the house around 10:30 a.m.

Corroboration on a nondispositive point like that is insufficient to establish *Strickland* prejudice. Again, whether defendant had money that morning does not contradict the victims' identification of him as the armed robber.

¶ 96    Moreover, in response to the State's motion to dismiss, postconviction counsel made no mention of this claim, and defendant's appellate counsel during oral arguments almost did the same. When prompted by the court to address the affidavit, appellate counsel stated the sister's purported testimony was not "strictly necessary." We note, like the majority, that the amended petition is missing a page related to this ineffectiveness claim. However, the burden of providing this court with a sufficiently complete record is on defendant, and in the absence of that record, we presume the trial court was correct in its ruling. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 394 (1984); *People v. Kirkpatrick*, 240 Ill. App. 3d 401, 406 (1992).

¶ 97                                    *Conclusion*

¶ 98    Last, I wish to note that the majority takes the rule that we must liberally construe a defendant's petition to an extreme not contemplated by the Act or case law interpreting it. Liberal construction is not the equivalent of cobbling together a petition for the defendant's benefit when it is defendant's burden in the first place under the Act and *Strickland*. Liberal construction does not excuse the allegations set forth above that are rebutted by the record, not well-pled, conclusory in nature, or simply legally insufficient. See *Domagala*, 2013 IL 113688, ¶ 35. Ultimately, advancing a petition that does not merit further attention to a third-stage evidentiary hearing is a waste of time and judicial resources, and it disrupts the delicate balance of respecting finality in criminal proceedings.

¶ 99    I therefore dissent for the aforementioned reasons.

*People v. Rouse*, 2022 IL App (1st) 210761

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-21758; the Hon. Nicholas Ford, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Gavin J. Dow, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Retha Stotts, and James Naughton, Assistant State's Attorneys, of counsel), for the People. |